## S91A0656. MALLORY v. THE STATE.
(409 SE2d 839)

CLARKE, Chief Justice.

Dr. Vincent Mallory was convicted of malice murder and arson.

He was sentenced to life imprisonment for the malice murder and to 20 years to run consecutively with the life sentence for the arson.[1] Dr. Mallory, a black male, was convicted of the murder of Shelby Fields, a white woman who was his patient. The state contended that he had a romantic relationship with the victim. The charred body of the victim, who had been shot in the head before being burned, was found in the home of Dr. George Fuller. Dr. Fuller, Ms. Fields' dentist and neighbor with whom she sold a nutritional product called "Shakelee," was out of town when his house burned. Ms. Fields had a key to his house. Ms. Fields told her son that she was going to get some "Shakelee" from Dr. Fuller's house and left her house at approximately 11:15 p.m. on the night of February 26, 1987. Police received a report that Dr. Fuller's house was on fire at approximately 1:00 a.m. February 27. Ms. Fields' car was found February 27 in the parking lot of a Kroger store in Warner Robins, Georgia.

Ms. Lucille Dodds, a friend of Ms. Fields, testified that in a telephone conversation at about 9:30 p.m. on February 26, 1987, Ms. Fields told her that she was going to have coffee with Dr. Mallory.

There was testimony that Dr. Mallory had attended a business fraternity meeting on the night of the fire. In a statement to police on April 4, Dr. Mallory said that he had gone straight home at approximately midnight after a party following the meeting. He admitted at trial that he had lied to police and that he visited the home of a former girl friend at 9:30 p.m. before going home. There was testimony at trial, however, that he had visited the house of Ms. Sherman Whitfield, his former girl friend, two times that night. She was not at home the first time, but she testified that he returned after midnight smelling of kerosene and took a shower. She also testified that on a previous occasion he indicated that he would shoot her and burn her house down around her if she ever "crossed" him.

The wife of one of the fire fighters testified that Dr. Mallory drove up to the scene of the fire on February 27 and asked "if they had found anybody in there yet."

In Dr. Mallory's statement to police on April 4, 1987, he said that he had owned three .22 caliber handguns in the last six months. There was testimony that Dr. Mallory traded a .22 caliber pistol on the day after the fire, February 27. This gun was not one of the three

---

[1] The crime was committed February 27, 1987. Appellant was indicted April 6, 1987. The trial was held September 10-23, 1987, before a jury. Appellant was convicted September 23, 1987, of malice murder, felony murder, and arson. He was sentenced the same day to life imprisonment for malice murder. On October 6, 1987, he was sentenced to 20 years for arson to run consecutive to the life sentence. A motion for new trial was filed September 24, 1987, and denied December 11, 1991. The notice of appeal was filed January 7, 1991, and the transcript certified January 25, 1991. The appeal was docketed in this court February 14, 1991, and the appeal was argued May 7, 1991.

described to police. At the time that he traded the gun, Dr. Mallory backdated a form which he filled out to show that the sale occurred February 26. However, a computerized invoice showed that the transaction occurred February 27. In his statement to police on April 4, Dr. Mallory said that he traded the gun on February 26 and worked in his office all day February 27. At trial, however, he testified that the trade occurred February 27.

Although the head wound of the victim was made by a .22 caliber bullet, only a portion of the bullet was recovered. The gun which was traded was not specifically tied to the murder. There was testimony that Dr. Mallory was a gun collector who had guns of many different kinds and that he had attempted to sell the .22 caliber pistol on previous occasions.

In his statement to police Dr. Mallory said that Shelby Fields had never been in his car or pick-up truck. However, vacuum sweepings of his truck yielded hairs which were found to be consistent with the hair of the victim.

1. Reviewing the evidence in the light most favorable to the jury's verdict, we hold that a rational trier of fact could have found appellant guilty of the crime for which he was convicted beyond a reasonable doubt even without the prejudicial hearsay evidence. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. We consider first the enumeration of error that the court allowed the hearsay testimony as to the contents of the telephone conversation of Lucille Dodds with the victim. The state contends that this conversation was admissible under OCGA § 24-3-1 (b), which provides that "hearsay evidence is admissible in specified cases from necessity." There are two prerequisites for admission of hearsay because of necessity: "1) necessity; 2) particularized guarantees of trustworthiness." *Idaho v. Wright*, ____ U. S. ____ (110 SC 3139, 111 LE2d 638) (1990); *Higgs v. State*, 256 Ga. 606 (351 SE2d 448) (1987).

The first prerequisite is met since the statements in question were made by the victim, who is now unavailable as a witness because she is deceased. In *Higgs v. State*, supra, the issue was admissibility of statements made to police by defendant's former wife who was not available at trial because she had remarried the defendant. The following indicia of trustworthiness were found: (1) declarant consulted an attorney before giving a statement to police; (2) the statement was given within hours of the event in the course of an official investigation; (3) the witness never retracted the statement or testified contrary to the statement; (4) the witness testified prior to trial that she refused to testify because she loved her husband. In *Adams v. State*, 191 Ga. App. 16 (381 SE2d 69) (1989), the issue was the admissibility of the statement of the defendant's 12-year-old niece who was apprehended after filling a forged prescription for the defendant. The wit-

ness was unavailable because she was hidden by family members. The Court of Appeals found that the necessity for the admission of the statement had been shown and that the following indicia of trustworthiness were present: (1) the statement was given in the course of an official investigation immediately after the child was apprehended; (2) she never recanted her statement or sought to change it; (3) parts of her statement were corroborated by other evidence.

None of these indicia of reliability is present here. The most persuasive of the state's arguments that the statement is reliable is that there was testimony that the women were "best friends" and confided in one another. The state also argues that Ms. Dodds had no reason to lie. The truthfulness of Ms. Dodds is only part of the issue here. Equally important is the truthfulness of Ms. Fields' statements. According to Ms. Dodds, Ms. Fields said that she had hurt the feelings of Dr. Mallory, a "dear friend" and that while she had said she would not meet him for breakfast, she had agreed to make coffee at her house or somewhere else. Beyond the fact that there was no reason for Ms. Fields to lie about meeting Dr. Mallory, there are no particular indicia of trustworthiness. Rather, the fact that the victim made a contradictory statement to her son as to where she was going on the night she was killed persuades us that her statement to Ms. Dodds is not sufficiently trustworthy to be admissible under the "necessity" exception to the hearsay rule.

Even without the admission the evidence adduced at trial is sufficient to support the verdict of guilty under the standard announced in *Jackson v. Virginia,* supra. Nevertheless, we cannot say that this inadmissible hearsay evidence did not influence the jury in reaching its verdict. Therefore, its admission was harmful error, and the judgment must be reversed.

3. Because the judgment is reversed, we need not deal with trial errors which may not arise on retrial. Specifically, the issues raised by appellant in enumerations of error one and two need not be dealt with here. These enumerations raise *Batson* errors and errors regarding the failure of the trial court to dismiss jurors for cause on the basis of racial prejudice.

4. Appellant contends that the state violated appellant's due process rights by deliberately interjecting race into the trial. According to appellant, the evidence did not support the state's contention that appellant was romantically involved with the victim and this fact, combined with the state's striking of black jurors, prejudiced the appellant. The state responds that this state has never recognized the principle of cumulative error and that each error must be separately shown, citing *Eady v. State,* 182 Ga. App. 293 (355 SE2d 778) (1987), and *Campbell v. State,* 181 Ga. App. 1 (351 SE2d 209) (1986). The state contends that this enumeration involves cumulative error and

may be disregarded.

The cases cited by the appellant deal with an enumeration of error in which an appellant argues that a trial was unfair under the totality of the circumstances. The Court of Appeals in both cases found that an enumeration based on the "totality of the circumstances" must fail when appellant has not presented argument on each point. The enumeration of error at issue here is slightly different. Appellant contends (1) that race was unfairly interjected into the trial by the unsubstantiated allegation of a romantic relationship between appellant and the victim and (2) that the prejudice was exacerbated because of *Batson* errors. The appellant argued the *Batson* issue strenuously in his first enumeration of error which we have not found it necessary to address. Since both parts of the present enumeration have been argued by appellant, it does not fall into the category of cumulative error.

The question presented is that of relevance. A romantic involvement between a defendant and a victim is often relevant to the question of motive whether the couple is of the same or different races, religious groups, nationalities, or sexes. Therefore, without a particular showing that the alleged involvement was introduced merely to prejudice appellant, we will not find an abuse of discretion by the trial judge in allowing the introduction of evidence of a romantic involvement.

5. Appellant contends that his right to remain silent was violated by the court's allowing the state to introduce that portion of his statement to police of April 4, 1987, which included the question why appellant had not come forward to explain his innocence when he knew that he was under investigation and his answer that he was waiting for police to come to him. The state insists that evidence regarding appellant's failure to come forward prior to arrest was properly admitted.

The United States Supreme Court has held that where no government action has induced a defendant's silence prior to his arrest, and where the defendant waives his privilege against self-incrimination by testifying at trial, the state may comment at trial upon the fact that he did not come forward voluntarily. *Jenkins v. Anderson*, 447 U. S. 231 (100 SC 2124, 65 LE2d 86) (1980). In *Fletcher v. Weir*, 455 U. S. 603 (102 SC 1309, 71 LE2d 490) (1982), the Court explained the "government action" which "induces" a defendant to remain silent referred to in *Jenkins v. Anderson* and its predecessor, *Doyle v. Ohio*, 426 U. S. 610 (96 SC 2240, 49 LE2d 91) (1976), as *Miranda* warnings. In *Fletcher v. Weir*, supra, the Court held:

> In the absence of the sort of affirmative assurances embodied
> in the *Miranda* warnings, we do not believe that it violates

due process of law for a State to permit cross-examination as to postarrest silence when a defendant chooses to take the stand. A State is entitled, in such situations, to leave to the judge and jury under its own rules of evidence the resolution of the extent to which postarrest silence may be deemed to impeach a criminal defendant's own testimony.

Id. at 607.

While finding that there is no U. S. constitutional prohibition against the comment upon silence in the setting described above, the Supreme Court in *Jenkins v. Anderson,* supra, noted that its decision did not force any *state court* to allow impeachment by prearrest silence: "Each jurisdiction remains free to formulate evidentiary rules defining the situations in which silence is viewed as more probative than prejudicial." Id. at 240. Accord *Fletcher v. Weir,* supra.

OCGA § 24-3-36 provides that "Acquiescence or silence, when the circumstances require an answer, a denial, or other conduct, may amount to an admission." We take this opportunity to hold that in criminal cases, a comment upon a defendant's silence or failure to come forward is far more prejudicial than probative. Accordingly, from the date of publication of this opinion, December 26, 1991, in the advance sheets of Georgia Reports, such a comment will not be allowed even where the defendant has not received *Miranda* warnings and where he takes the stand in his own defense. To the extent that the holding in *Fraley v. State,* 256 Ga. 178 (345 SE2d 590) (1986), conflicts with this holding, it is overruled.

6. Appellant complains that his rights were violated by the state's complicity in the knowing use of fraudulent and misleading testimony concerning the autopsy of the victim. Warren Tillman, a forensic scientist with the State Crime Lab who performed an autopsy upon the victim, testified that a discrepancy in the autopsy report concerning the presence of a uterus in the victim was due to a dictation error on his part. Just prior to trial it was revealed that Shelby Fields had no uterus. The witness called Dr. Joseph Burton, a forensic pathologist, concerning this discrepancy, and appellant asserts that Dr. Burton told Mr. Tillman that he should testify to his error. Mr. Tillman testified that he must have made a *dictation* error. In response to the appellant's insistence that this constituted false or misleading testimony sanctioned by the state, the state responds that it did not sanction false or misleading testimony and that it was Dr. Burton who suggested that the error concerning the presence of the uterus might have been a dictation error.

We do not need to decide whether Mr. Tillman or Dr. Burton first provided the explanation of a dictation error for the erroneous information in the autopsy report. The testimony of Mr. Tillman at

trial acknowledged the error in the autopsy report, and appellant's counsel had an opportunity for a thorough cross-examination. This enumeration of error is without merit.

7. Appellant next contends that his rights were violated by the introduction of evidence obtained through the state's exhuming the victim's body on the eve of trial, on September 5, 1987, for purposes of further identification. Appellant complains that he was not notified of the body's being exhumed and had no expert present. The state responds that there was no requirement that the state inform the appellant of the exhumation of the body.

The trial court, in orders of July 1, 1987, and August 12, 1987, granted motions by appellant to preserve evidence, to allow examination of dentures used in identification of the body, and to have his own experts examine and test physical evidence.[2] These orders are somewhat confusing. The earlier order appears to be continuing in nature while the second order allows examination and testing on August 13. On September 3, 1987, the appellant sought an order requiring medical records of a hysterectomy performed upon Shelby Fields in 1985. Appellant then moved to dismiss the indictment on the basis that the autopsy report referred to the presence of a uterus in the body identified as that of Shelby Fields. On September 5, while voir dire was being conducted in the trial of this case, the body was exhumed and re-examined.

Appellant insists that the exhumation of the body without the presence of the appellant's expert constituted a denial of due process and is the basis for a new trial. The state responds that as early as July 1, 1987, appellant had the independent right to exhume the body and on August 12, 1987, he had the right to independently examine and test all of the state's physical evidence on August 13 at the crime lab.

We consider first whether there was any denial of appellant's due process rights in the state's exhuming the body for further identification purposes. We hold that the exhumation itself was proper even though it occurred on the eve of trial since it concerned identification of the victim.

The crucial question for our consideration is the appellant's contention that he had the right to have his own expert present at the exhumation. "A criminal defendant on trial for his liberty is entitled on motion timely made to have an expert of his choosing, bound by appropriate safeguards imposed by the court, examine critical evidence whose nature is subject to varying expert opinion." *Sabel v.*

---

[2] From the context it appears that "dentures" refers to the victim's own teeth rather than artificial dentures.

*State*, 248 Ga. 10, 17-18 (282 SE2d 61) (1981), cert. denied, 454 U. S. 973. As the state points out, the July 1, 1987, order of the court in response to appellant's pretrial motions did not give the appellant the right to have an expert physically present at the exhumation of the body. However, this order did give the appellant the right to an independent examination of the dentures used to identify the body even if this examination required an exhumation. The order of August 12, 1987, gave appellant the right to examine physical evidence in custody of the state on August 13 at the crime lab. Therefore, from the time that appellant first learned of the error in the autopsy report, he had an independent right to inspect and test the dentures even if this required exhumation of the body.

There is no indication that appellant ever took advantage of his right to an independent inspection of this evidence. It is unclear whether the order entered August 12, 1987, covered non-dental evidence generated by an autopsy after that date; however there is no indication that the appellant sought to have the order expanded to cover a second autopsy. We have found nothing in the record indicating a motion to inspect the evidence generated by the September 5 autopsy. According to the state, he never availed himself of his rights under the July 1 and August 12 orders to inspect and independently test the state's evidence.

The focus of appellant's argument is, however, not on the dentures but on the presence or absence of a uterus. The appellant's complaint concerning the fact that he had no expert present at the exhumation and second autopsy apparently is that had he had the opportunity to examine the body when exhumed, he would have had the opportunity to see whether there was a uterus in the body as indicated in the first autopsy report. The fact remains that he could have exhumed the body and presumably conducted an independent examination of the remains under existing court orders.

Even though existing court orders did not give the appellant the right to be present at an autopsy, we are troubled by the action of the state in this case. We do not approve the state's exhuming the body and conducting a second autopsy even as the voir dire was occurring without the presence of some representative of appellant. We need not reach the question whether the admission of the information from the second autopsy constituted reversible error. If a retrial of this case is held, the opportunity for independent testing of the remains still exists.

*Judgment reversed. All the Justices concur, except Smith, P. J., who dissents as to Division 4, but not the judgment; Hunt, J., not participating.*

Benham, Justice, concurring.

While I agree completely with the majority's judgment of reversal and with the reasoning leading to that judgment, my conviction that there was another reversible error at trial which should be addressed by this court compels me to write separately. That error occurred when the trial court accepted the prosecution's explanation for peremptory strikes used to exclude four black members of the venire.[3]

However, before addressing the state's explanations of its use of peremptory strikes, there is a procedural issue which desperately needs to be addressed. In many cases coming to this court with a *Batson*[4] issue, including this case, no ruling is made by the trial court as to whether a prima facie case has been established under *Batson*. Nevertheless, the side whose peremptory strikes have been called into question is then encouraged to place its explanations on the record in the event it is determined at a later date that a prima facie case has been established.

The failure of a trial court to rule on the threshold issue of the establishment of a prima facie case under *Batson* can have serious consequences for the parties: the lack of a ruling may unintentionally minimize the importance of the issue and thereby either unnecessarily chill the enthusiasm and pursuit of the party raising the issue, or inadvertently lull into a sense of complacency the party against whom the allegation has been made and prevent a vigorous defense from being put forth. The better policy would be for the trial court to make a ruling on the prima facie issue before entertaining explanations and then, whether it finds a prima facie case was made or not, to allow explanations so that the record can be perfected. *State v. Jones*, 293 S. C. 54 (358 SE2d 701) (1987).

An unmistakable theme of inclusiveness as to jury service runs throughout *Batson* and its progeny, and in keeping with that theme, the trial courts are required to evaluate rigorously the explanations given for the exercise of suspect strikes. When it appears that the trial court has failed to analyze and has accepted at face value the explanations given, the appellate courts will undertake an independent analysis of the explanations to determine if they in fact comport with the *Batson* requirements of neutrality, relevancy, legitimacy and specificity.

In *Gamble v. State*, 257 Ga. 325 (5) (357 SE2d 792) (1987), this court discussed at some length the process of evaluating the prosecution's explanations for the use of peremptory challenges:

---

[3] The trial court did reject the explanations offered for the use of peremptory strikes against two black jurors.

[4] *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

The proscription laid down in *Batson* is that a prosecutor may not strike a black juror solely because of his race, nor may he strike on the basis of an assumption which arises "solely from the jurors' race," nor may he strike "to exclude . . . veniremen from the petit jury on account of their race." [Cit.]

The trial court's findings are, of course, entitled to "great deference," [cit.], and will be affirmed unless clearly erroneous.

However, " '[r]ubber stamp' approval of all nonracial explanations, no matter how whimsical or fanciful, would cripple *Batson*'s commitment to 'ensure that no citizen is disqualified from jury service because of his race.' " [Cits.]

In order to rebut a prima facie case of racial discrimination in the exercise of peremptories, the prosecutor must explain each peremptory challenge of a black prospective juror. The explanation "need not rise to the level justifying exercise of a challenge for cause," but it must be "neutral," "related to the case to be tried," and a " 'clear and reasonably specific,' explanation of his 'legitimate reasons' for exercising the challenges." [Cit.]

The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor's other peremptory strikes, and, as well, in light of the strength of the prima facie case. The persuasiveness of a proffered explanation may be magnified or diminished by the persuasiveness of companion explanations, and by the strength of the prima facie case.

A court charged with the duty of determining whether the prosecutor has rebutted a prima facie case may be less troubled by one relatively weak explanation for striking a black juror when all the remaining explanations are persuasive than where several of the prosecutor's proffered justifications are questionable. Similarly, a weak prima facie case may be rebutted more readily than a strong one.

While this court should and does give deference to the trial court's determination regarding the state's exercise of peremptory strikes against members of a particular class, as in *Gamble*, we are not required to give such determination absolute deference.

My special concurrence in *Hayes v. State*, 261 Ga. 439 (405 SE2d 660) (1991), pointed out the need to "usher in an era of ungrudging acceptance of the basic tenet of *Batson*, that is, that the integrity of the jury selection process, and thereby the entire justice system, is enhanced greatly when fitness for jury service is not determined by

race." It is the pursuit of this goal that compels me, while giving due deference to the trial court's determination, to make a rigorous examination of the explanations given by the state for its exercise of peremptory strikes, especially when those strikes appear to fall disproportionately heavily on a particular class.

Because this is a relatively new area of the law for trial judges, this court should undertake to provide the trial courts with some analytical framework for evaluating the explanations offered for the exercise of suspect peremptory strikes. Therefore, in determining whether the state has articulated some legitimate, non-discriminatory reason for its exercise of peremptory strikes, the trial court should be mindful of the circumstances which gave rise to the *Batson* decision, and should take into consideration many factors, including but not limited to the following: (1) susceptibility of the particular case to racial influences; (2) statements made during voir dire; (3) race of victim and primary witnesses; (4) the prosecutor's demeanor; (5) patterns, if any, of discrimination by the prosecutor's office [lack of a pattern alone should not exempt the explanation from rigorous scrutiny]; and (6) the method of questioning and treatment of similarly situated jurors of a different race. *State v. Butler*, 731 SW2d 265, 269 (Mo. App. 1987). See also *Ex parte Branch*, 526 S2d 609, 623 (Ala. 1987), and *State v. Slappy*, 522 S2d 18 (Fla. 1988). In addition, when viewing the explanations offered in defense of the suspect strikes, I find instructive the suggestion in *Horton v. Zant*, \_\_\_\_ F2d \_\_\_\_ (11th Cir. 1991) (Case No. 90-8522, decided September 3, 1991, slip op. p. 22) that

> in evaluating [the] rebuttal it is appropriate to keep in mind that "testimony from the alleged discriminators should be viewed with a great deal of judicial scrutiny." [Cit.]

Looking first at the explanations offered for other strikes, it should be noted that the trial court appropriately rejected the explanations the prosecution gave for striking two black prospective jurors. The weakness of those explanations reduces the persuasiveness of the explanations offered for the four strikes at issue. *Gamble*, supra.

Two reasons were given for exercising a peremptory challenge to remove juror Miller. The first was that she "most likely" had discussed Mallory with co-workers who were his patients. The record reveals, however, no evidence that Miller had engaged in a conversation with the co-workers at question, only that she heard someone mention being a patient of Mallory's. In *Gamble*, this court held that the fact that a juror stated that he knew the district attorney did not support an inference that the witness had been involved in a child support case and would be biased against the district attorney. Simi-

larly, Miller's testimony that she heard others say that appellant was their doctor did not raise the inference that Miller had discussed appellant with those co-workers and was, therefore, not impartial. The second reason for striking Miller was that she looked at the defendant's table "as if for feedback for her response" and that she smiled at defense counsel as she left the courtroom. Since the voir dire record did not preserve facial expressions or gestures, and the trial court refused to permit defense counsel to either question the prosecutor or present other evidence on the issue, there is no support in the record for the State's bald assertion concerning the juror's conduct.

Juror Gary, a nurse, was stricken from the jury because she worked in the "medical profession" and might be sympathetic toward appellant because he is a doctor. However, the record showed that several white prospective jurors were not excluded for their connections to the medical profession: one is an administrator of a nursing home; another is a billing clerk at a hospital; another is a pathology laboratory assistant and an emergency medical technician, married to a physician's secretary; and another is a social worker with regular substantial contact with the medical and mental health communities, married to a clinical psychologist.

The explanation for striking juror Killen from the jury was that he had been convicted of two misdemeanor offenses and that he stated that law enforcement people were not inclined to tell the truth. One of those convictions was a 1967 DUI conviction; three white jurors who were accepted by the State had DUI convictions in 1979, 1981, and 1986. Killen's remark concerning the credibility of law enforcement personnel was misstated by the prosecutor: Killen actually stated that he did not hold the opinion that law enforcement officers are more inclined to tell the truth than anyone else, a position shared during voir dire by several white jurors who were not peremptorily challenged.

Juror Lester was challenged on the ground that he knew someone who attended Shiloh Baptist Church and had, therefore, been exposed to the preaching of a minister who was active in raising funds for the defense. That explanation is as far-fetched as the similar explanation found suspect in *Gamble*, that one of the jurors lived near a church whose minister held views on the case different than those of the prosecutor.

Here, as was the case in *Gamble*,

[s]everal of the proffered explanations were suspect. In some instances, similarly situated white jurors were not challenged. Other reasons were not related to the case on trial. Some jurors were excluded on questionable premises. [Id. at 329-330.]

Applying the standards enunciated in *Gamble* to the explanations offered in the present case for the peremptory challenges used to remove four black jurors should yield the same result reached in *Gamble*, a new trial. I would, therefore, reverse the conviction on that ground.

DECIDED NOVEMBER 1, 1991.

*Martin Brothers, John R. Martin, Carl A. Bryant,* for appellant.
*Edward D. Lukemire, District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,* for appellee.