A91A2224. JACKSON v. THE STATE.
(414 SE2d 905)

McMURRAY, Presiding Judge.

On October 1, 1990, defendant was indicted on charges of rape,
aggravated sodomy, burglary and robbery committed on the night of
January 3, 1990, and the early morning hours of January 4, 1990. De-
fendant was arrested on January 4, 1990, and brought to trial on No-
vember 7, 1990. He was convicted on all charges and sentenced to
consecutive life terms on the rape and aggravated sodomy charges to
be followed by concurrent 20-year terms on the burglary and robbery
charges. This appeal follows the denial of defendant's motion for a
new trial.

The following evidence was adduced upon the trial of the case:

On January 3, 1990, the victim, a 70-year-old woman, attended the funeral of her husband and returned home. At approximately 10:00 p.m., a man came to the victim's door and asked if he might use her bathroom. When the victim refused, the man asked if he might use her telephone. The victim replied that she did not have a telephone and closed the door. Approximately one hour later, a man grabbed the victim from behind, pushed her to the floor and demanded money and a gun. The victim gave the man some money; she did not have a gun. The man stayed in the victim's home about 30 minutes, looking through her things. He took a "good bit" of the victim's jewelry. Then, he left.

Because she did not have a telephone, the victim could not seek help without venturing outside. Unable to walk very well, and hurting from the attack, the victim thought it would be better to stay in her house than to go outside and risk another attack in the dead of night. She decided to secure her home as best as she could and wait for daylight.

At approximately 6:30 a.m., the same man entered the victim's home again. He forced her into her bedroom where he raped and sodomized her repeatedly. Then the man went into the victim's kitchen where he opened and ate a can of pork and beans. Before leaving again, at approximately 8:00 a.m., the man took the rest of the victim's money — a dollar and change.

She summoned help and the police arrived at the scene. The victim described her attacker as a black male in his mid-twenties, of average height and weight, with plaited hair, wearing a baseball cap.

One officer spoke with the victim's neighbors to see what they might have observed. One neighbor informed the officer that a man came to her house the same night, asked to use the telephone and bathroom, and left when she unveiled a gun. She told the officer that she knew the man as "B. J."

The officer knew a man called "B. J." who worked at the courthouse and fit the description of the victim's attacker. He discovered "B. J." in a nearby house.

"B. J." was hiding in a rear bedroom of the house. He was arrested and taken into custody. Several items of jewelry and a baseball cap were recovered from the house in which "B. J." was hiding. The jewelry was identified as the jewelry which had been taken from the victim's house. The baseball cap was identified as the cap worn by the victim's attacker.

At trial, a forensic serologist with the state crime laboratory testified that vaginal swabs and blood samples were sent to the Federal Bureau of Investigation ("FBI") for "DNA" (deoxyribonucleic acid) analysis; and that it takes between 15 and 20 weeks to obtain the results of such tests. He also testified that he obtained the victim's

bed sheets 12 days after the crime was committed; but added that he preferred to have the vaginal swabs — not the bed sheets — examined because seminal fluid on a bed sheet may be from a different time and source.

The forensic serologist also testified that the DNA test results were inconclusive: defendant could neither be identified nor eliminated as a suspect. In this regard, the witness suggested that there may not have been enough material to conduct the test or the material may have become too degraded.

Following established procedure, the forensic serologist waited for the FBI to complete the DNA tests before performing "secretor testing" on the bed sheets. In this regard, the serologist testified that DNA testing is preferred because it has greater "discriminating potential."

According to the serologist, the results of the secretor tests were also inconclusive: The seminal stain on the bed sheets indicated (1) the victim's attacker was a non-secretor or (2) the sample had deteriorated too far to perform the test. Thus, the serologist testified, defendant could not be eliminated as a suspect simply because he is a "secretor."

In connection with the "secretor" testing, the forensic serologist testified that defendant is blood type O and he acknowledged that (1) blood type O is less stable than other blood types and (2) it can lose its "activity" in about one month. He testified that he knew defendant's blood type when he sent the vaginal swabs to the FBI and he acknowledged that he did not perform the "secretor" tests until he received the FBI's report. He testified, however, that even if he had performed the "secretor" tests within a month, the results would have been inconclusive.

The victim's neighbor (who identified the man who came to her door as "B. J.") died before the case was tried. Cross-examining the officer who spoke with the neighbor, defense counsel asked whether the neighbor was able to pick defendant out of a lineup. The officer replied that she was not. On redirect examination, the officer added that the neighbor thought defendant was the man who came to her door but she was not sure. On recross examination, the officer admitted that he did not put the latter statement of the neighbor in his police report. *Held*:

1. Defendant was arrested on January 4, 1990. He was indicted on October 1, 1990, and brought to trial on November 7, 1990. Prior to trial, defendant filed a "motion to dismiss for preindictment delay." The motion was denied and defendant enumerates error upon that ruling. "In Barker v. Wingo, 407 U. S. 514 (92 SC 2182, 33 LE2d 101), the Supreme Court of the United States identified four factors which it stated the court should weigh in balancing the conduct of the

prosecution and the defendant on the issue of the denial of the constitutional right to a speedy trial. These four factors are: (1) length of delay, (2) the reason for the delay, (3) the defendant's assertion of his right, and (4) prejudice to the defendant." *Treadwell v. State*, 233 Ga. 468, 469 (211 SE2d 760). None of the four factors is regarded as being necessary to a finding that a defendant was deprived of his right to a speedy trial; on the contrary, the factors are related and must be balanced together. As it is said: "[T]hese factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo*, 407 U. S. 514, 533 (92 SC 2182, 33 LE2d 101).

Defendant concedes that the first factor, the length of delay, is relatively "insignificant." "The mere passage of time is not enough, without more, to constitute a denial of due process." *Hughes v. State*, 228 Ga. 593, 594 (1), 595 (187 SE2d 135) (delay of 20 months between indictment and trial). With respect to the third factor, the State concedes that defendant asserted his right to a speedy trial. The parties disagree, however, with respect to the significance of the second and fourth factors.

With regard to the second factor, the reason for the delay, defendant contends the delay was intended to deprive him of his ability to test the evidence independently. The State asserts the only reason for the delay was to await completion of the investigation.

We do not think the reason for the delay weighs against the State in any way. "[W]e find no evidence whatsoever of a deliberate attempt by the State to delay the trial in order to hamper the defense." *Crapse v. State*, 180 Ga. App. 321, 323 (349 SE2d 190). Rather, it appears that the delay was occasioned only by the standard operating procedure of the state crime laboratory. Compare *Hall v. State*, 131 Ga. App. 786 (206 SE2d 644) (delay of 34 months was negligence at the least).

Finally, with respect to the fourth factor, we are unable to see any prejudice to the defense. We are not persuaded by defendant's argument that he was prejudiced because the bed sheets were not subjected to a secretor test early on. The forensic serologist testified that the state crime laboratory preferred to conduct tests using vaginal swabs because bed sheets could contain seminal fluid from a different source and time. Thus, if the bed sheets had been tested earlier, defendant would not have been eliminated as a suspect.

Defendant's contention that he was prejudiced because the victim's neighbor died before trial is without merit. He has not demonstrated just how the neighbor's death prejudiced his defense. See *Perry v. Mitchell*, 253 Ga. 593, 595 (322 SE2d 273); *Hughes v. State*, 228 Ga. 593, 595, supra. By cross-examining the investigating officer, defendant was able to elicit the fact that the neighbor was unable to

identify defendant positively as the man who came to her door on the night in question. The testimony of the deceased neighbor would have been merely cumulative on this point. See *Hughes v. State*, 228 Ga. 593, 595, supra.

2. Defendant contends the trial court erred in permitting the officer to testify that the deceased neighbor told him that on the night in question a man called "B. J." came to her door and asked to use the bathroom and telephone; and that he knew a man called "B. J." who worked at the courthouse and matched the description of the victim's attacker. In this regard, defendant asserts the evidence was inadmissible under the holdings in *Teague v. State*, 252 Ga. 534 (314 SE2d 910) and *Momon v. State*, 249 Ga. 865 (294 SE2d 482). We need not decide whether the evidence violated *Teague* and *Momon* because it was admissible out of necessity under OCGA § 24-3-1 (b).

"In *Higgs v. State*, 256 Ga. 606 (351 SE2d 448) (1987), the Georgia Supreme Court, citing *Ohio v. Roberts*, 448 U. S. 56, 65 (100 SC 2531, 65 LE2d 597) (1980), held that the United States Supreme Court had 'not interpreted "confrontation" to signify the exclusion of every hearsay exception, and has provided (a) method to resolve confrontation challenges based on the admission of hearsay testimony: ". . . First, . . . the Sixth Amendment establishes a rule of necessity. In the usual case . . . the prosecution must either produce, or demonstrate the unavailability of, the declarant whose statement it wishes to use against the defendant. (Cits.) The second aspect operates once a witness is shown to be unavailable . . . (O)nly hearsay marked with such trustworthiness that 'there is no material departure from the reason of the general rule (may be admitted).' " (Cit.)' *Higgs*, supra at 608, 609 (7). See also *Swain v. C & S Bank of Albany*, 258 Ga. 547 (372 SE2d 423) (1988)." *Adams v. State*, 191 Ga. App. 16, 17 (381 SE2d 69). In sum, "[t]here are two prerequisites for admission of hearsay because of necessity: '1) necessity; 2) particularized guarantees of trustworthiness.' *Idaho v. Wright*, ___ U. S. ___ (110 SC 3139, 111 LE2d 638) (1990); *Higgs v. State*, 256 Ga. 606, [supra]." *Mallory v. State*, 261 Ga. 625, 627 (2) (409 SE2d 839).

The first prerequisite is met inasmuch as the statements were made by a witness who is deceased. *Mallory v. State*, 261 Ga. 625, 627 (2), supra. The second criteria is met inasmuch as (1) the witness's statement was given shortly after the event; (2) the witness's statement was given during the course of an official investigation; and (3) there was no testimony that the witness retracted the statement or controverted the statement. See *Higgs v. State*, 256 Ga. 606, supra; *Adams v. State*, 191 Ga. App. 16, supra. It follows that the trial court did not err in admitting the statements of the neighbor.

*Judgment affirmed. Sognier, C. J., and Andrews, J., concur.*

DECIDED JANUARY 16, 1992 —
RECONSIDERATION DENIED JANUARY 28, 1992 — ▮▮▮▮▮▮▮▮

*Word & Flinn, Gerald P. Word,* for appellant.
*William G. Hamrick, Jr., District Attorney, George F. Hutchinson III, David Oliver, Assistant District Attorneys,* for appellee.