303 Ga. 373
FINAL COPY

S17A1549. ELLER et al. v. THE STATE.

GRANT, Justice.

Appellant Steven Mark Eller was found guilty of malice murder and other crimes, and his sister, Appellant Tammy Murphy, was found guilty of felony murder and other crimes, all in connection with the March 2013 shooting death of Murphy's boyfriend, Danny Lamar Gravley. Appellants now appeal, asserting that the evidence was insufficient to sustain Murphy's felony murder and aggravated assault convictions, that the trial court committed reversible error by allowing the alternate jurors to remain in the jury room during deliberations, and that Appellants' trial counsel each rendered ineffective assistance for several reasons. Finding no reversible error, we affirm.[1]

---

[1] The murder was committed on the night of March 16-17, 2013. Eller and Murphy were indicted by a Bartow County grand jury for malice murder, felony murder based on aggravated assault, aggravated assault, concealing the death of another, and possession of a firearm during the commission of a felony. At the conclusion of a joint trial held from August 25 - 28, 2014, a jury found Eller guilty of all counts and

I.

Viewed in the light most favorable to the jury's verdict, the evidence at trial showed that Danny Lamar Gravley lived with his girlfriend, Tammy Murphy, and her brother, Steven Mark Eller, the two Appellants in this case. On March 16, 2013, Gravley's nephew, Jason, gave Gravley a ride home from a funeral that they attended together. Jason made plans with Gravley to go to church and move a china cabinet the following day.

The next morning, March 17, 2013, officers from the City of Emerson Police Department discovered an abandoned white pickup truck with Gravley's dead body lying in the bed of the truck. He had been shot in the

Murphy not guilty of malice murder and possession of a firearm during the commission of a felony but guilty on all other counts. The trial court sentenced Eller to life imprisonment for malice murder, with consecutive ten and five year sentences for concealing the death of another and possession of a firearm during the commission of a felony, respectively. The trial court purported to merge the other counts into the malice murder count, but the felony murder count should have been vacated by operation of law. See *Culpepper v. State*, 289 Ga. 736, 737-739 (715 SE2d 155) (2011). The trial court sentenced Murphy to life imprisonment for felony murder and five years consecutive for concealing the death of another, with the aggravated assault count merging for sentencing purposes. Murphy and Eller filed timely motions for new trial on October 7 and 17, 2014, respectively, which were subsequently amended twice. Hearings were held on the motions on November 29, 2016 and January 31, 2017, and the motions were denied, as amended, on February 8, 2017. Eller and Murphy filed their notices of appeal on February 14, 2017. The appeals were docketed to the August 2017 term of this Court and thereafter were submitted for a decision on the briefs.

head. An autopsy later determined that Gravley was shot once in the head with a .38 bullet fired from a handgun. There was no blood in the cabin of the truck but the passenger's seat was full of personal items, including a footlocker and clothing, leaving only enough room for the driver in the cab. GBI agents reasoned that Gravley had been shot in another location because there was no blood spatter in the truck bed. The lividity and temperature of the body suggested that the victim had been dead for several hours.

Meanwhile, Gravley's nephews were trying to determine his whereabouts. Jason called Murphy to ask where Gravley was, and she told Jason that she and Gravley had gotten into an argument the previous night and that she had not seen him since he left around 10:00 p.m. Murphy told the same story to another of Gravley's nephews, Charlie. Both nephews thought Murphy sounded unusually "matter-of-fact," "detail[ed]," "plain," and "deliberate" in how she described the events of the previous night.

When GBI agents arrived at Appellants' residence, the fire department was there responding to a backyard fire that was out of control. Murphy told firefighters that she was burning "stuff" in the back yard. Firefighters extinguished the flames and noticed that trash and household items were being burned. GBI agents knocked on the door, and Eller answered. He had a serious

foot injury. Agents informed Eller and Murphy that Gravley was dead. According to an agent, Murphy "cried just a little, not as much as you would normally expect of someone who had lost a loved one." Both Appellants denied harming the victim. According to Murphy, there had been a domestic altercation the night before, during which Gravley bit her. She said that Gravley left in his truck because he "wanted to go off and just blow off some steam," and that she had not seen him since. Murphy had a bite mark on her wrist and bruising near her elbow. The bite mark was consistent either with Murphy having bitten herself or with Murphy's arm being around the neck of the person who bit her.

The following day, Sergeant Jonathan Rogers, along with other police officers from the Bartow County Sherriff's Office, went back to the residence shared by Appellants and Gravley. When law enforcement arrived, Murphy's daughter and Eller were there, but Murphy was not. Eller left the house with investigators, and Sergeant Rogers waited for Murphy to return. While in the back yard, Sergeant Rogers observed what appeared to be blood on the siding of the house, on a step going up to the back deck, and on two fence posts. Sergeant Rogers saw Murphy drive toward the house and then turn around and drive away. Suspecting that she was attempting to avoid law enforcement, he

followed her without his blue lights activated. Murphy apparently noticed that Sergeant Rogers was following her and, after driving for about half a mile, she pulled over and exited her vehicle. Murphy appeared "nervous and edgy," and agreed to go back to her house to speak with Sergeant Rogers. While Sergeant Rogers was speaking with Murphy, officers began to search the premises pursuant to a search warrant.

Sergeant Rogers advised Murphy of her rights under *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), but explicitly informed her that she was not under arrest and that she was free to go. A search of Murphy's car revealed small red stains that appeared to be blood on the passenger's "pull down handle." Sergeant Rogers asked Murphy to look at those markings to see if there could be some kind of explanation for why they would be there but she "could not offer any kind of explanation, did not say anything." Appellants' shoes were also seized—no blood was found on Murphy's shoes, but Eller's shoes revealed blood from an unknown source.

The next day, Appellants voluntarily appeared at the sheriff's office, waived their *Miranda* rights, and gave separate interviews to law enforcement. Murphy said that she and Gravley had been arguing all night on March 17, noting that "it happens all the time." According to Murphy, she and Gravley

were fighting in her bedroom, and she left and went to Eller's bedroom for help, but Eller was not there. Gravley, who had a gun at the time, followed Murphy into Eller's room and was calling Murphy names and threatening her. She said he also bit her. Gravley then grabbed her and threatened to have someone come kill her. In Murphy's telling, Eller then came up behind Gravley and the two men struggled for the gun. The struggle over the gun caused Eller, Gravley, and Murphy to fall onto Eller's bed, and when they fell, the gun went off. Murphy admitted that she was drunk and that, after the shot, "many drunken decisions were made." She also said that she had gotten Gravley's body out through the front door. The next thing Murphy recalled was that she drove Gravley's truck down Interstate 75. She stated that "Gravley's gun was thrown out along I-75 somewhere."

Eller's version of events was similar, but not identical. He said that he had sustained a foot injury during the incident that was "killing him," but was too nervous to go to the hospital. Eller also indicated that he had a "drunken memory" of the incident, and stated that his brother and sister-in-law had come to the house to drink and that "everyone was buzzing." At some point, his brother and sister-in-law left, and he went to the back yard and set a stump on fire. When he went to his bedroom, he saw Gravley pointing a gun at Murphy,

so he ran up behind Gravley and knocked his arm in the air to deflect the aim from Murphy. Eller said that he knocked the gun out of Gravley's hand and grabbed it in an "upside-down fashion." Gravley threw his weight back onto Eller's ankle, which caused Eller and Gravley to fall to the bed. When they fell, the gun went off, killing Gravley. After the shooting, Eller began "freaking out" and made some "stupid decisions." He stated that he did not call emergency services because he and his sister thought they would not believe a drunk person. He cleaned the house and burned everything by throwing it onto the stump fire. Eller told police that he wrapped Gravley's body in a shower curtain and "drug his fat a** through the living room and out the front door, down the damn porch steps," and loaded him into the back of Gravley's truck. He admitted to leaving Gravley's body in the back of the truck and throwing the gun out the window on Interstate 75. Eller also commented that he was bothered that Murphy had "moved that a**hole in," but that they depended on Gravley as a source of income for their residence because Eller could not work due to an injury.

Appellants were arrested, and officers executed a second search warrant at their residence. Using a black light device, officers found stains on the bed's box spring, the carpet near the door, the bedroom wall, a vent cover, and on

only the inside of the bedroom door, lined up with the wall and trim with the door closed.

At trial, Eller claimed accident and justification. Murphy argued that she never touched a gun and that the evidence showed only that she was a victim of an aggravated assault committed by Gravley. GBI Chief Medical Examiner Dr. Lora Darrisaw was tendered by the State as an expert witness and testified that Gravley's injuries were inconsistent with an accidental shooting because of "the pattern of the wound on the skin, the presence of soot on the bone at the entrance wound site, the location of the wound in the back of the head, [and] the direction of the wound with no upward or downward deviation," but instead "nearly perpendicular to his body." She also noted that Gravley had abrasions on his face that were consistent with hitting a hard surface, which could have been the ground when he fell following the gunshot.

Gravley's nephew testified that he had never seen Gravley carry a weapon, and opined that Gravley "wasn't a weapons person." The defense, on the other hand, proved that Gravley had purchased a .38 handgun. Several defense witnesses, including Murphy's sister-in-law and a friend of Murphy's who was incarcerated at the time of trial, testified about previous incidences of domestic violence by Gravley against Murphy. The State called two rebuttal

witnesses, including Gravley's ex-wife, who testified as to Gravley's nonviolent nature.

Although Eller has not challenged the sufficiency of the evidence supporting his convictions, we have independently examined the record according to our usual practice in murder cases and conclude that the evidence admitted at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Eller was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 318-319 (99 SCt 2781, 61 LE2d 560) (1979).

## II.

As for Murphy, she asserts that the evidence admitted at trial was insufficient to support her convictions of felony murder and aggravated assault because the evidence, at best, showed that Murphy was merely an accessory after the fact to Gravley's killing.

We start with the legal standard for assessing the legal sufficiency of evidence to support a conviction. "Evidence may be less than overwhelming, but still sufficient to sustain a conviction." *Walker v. State*, 296 Ga. 161, 163 (766 SE2d 28) (2014). And when we consider the evidence's legal sufficiency, "we must 'put aside any questions about conflicting evidence, the credibility

of witnesses, or the weight of the evidence, leaving the resolution of such things to the discretion of the trier of fact.' Instead, we must view the evidence in the light most favorable to the verdict." Id. (quoting *White v. State*, 293 Ga. 523, 523 (753 SE2d 115) (2013)). "[W]e inquire only whether any rational trier of fact might find beyond a reasonable doubt from that evidence that the defendant is guilty of the crimes of which [s]he was convicted." Id. (citing *Jackson*, 443 U. S. at 319).

There is no dispute that, as we have already found, the evidence was sufficient to show that Eller committed an aggravated assault upon Gravley and murdered him with malice aforethought. There is also no dispute that Murphy and Eller both went to great lengths to conceal Gravley's death, working together to dispose of his body, get rid of the murder weapon, clean up and destroy evidence at the residence, and then lie to Gravley's family and law enforcement. All of this evidence may also support a jury's finding that Murphy aided and abetted the assault. See *State v. Cash*, 302 Ga. 587, 596 (807 SE2d 405) (2017) (evidence that daughter "actively lied to police" about relevant facts, "and that she not only affirmed her mother's varying versions of events, but immediately following the shooting began to promote to third parties their joint stories" supported finding that she aided and abetted the

killing); *Navarrete v. State*, 283 Ga. 156, 158 (656 SE2d 814) (2008) (defendant's intent to commit the crimes of aggravated assault and felony murder may be inferred from evidence that defendant previously assaulted victim, stood by and watched co-defendant stab victim before making any effort to intervene, participated in plot to burn body, did not initially attempt to report the crime even when questioned by authorities, and stood lookout when co-defendants later buried body).

Although it is true that a mere "accessory after the fact is not considered an accomplice to the underlying crime itself," *Higuera-Guiterrez v. State*, 298 Ga. 41, 44 (779 SE2d 288) (2015), "criminal intent may be inferred from presence, companionship, and conduct before, during and after the offense." *Navarrete*, 283 Ga. at 158 (citation and punctuation omitted). And when "the crimes 'involve relatives, slight circumstances can support the inference that the parties colluded.'" *Teasley v. State*, 288 Ga. 468, 469 (704 SE2d 800) (2010) (quoting *Adamson v. State*, 238 Ga. App. 105, 106 (516 SE2d 310) (1999)). Here, there is sufficient evidence from which Murphy's criminal intent could be inferred beyond the evidence showing that she also conspired with Eller after Gravley's death.

Murphy admitted that she was arguing and fighting with Gravley the night he was killed. There was also testimony that the bite mark on Murphy's arm may have been self-inflicted or sustained during a struggle with Gravley in which she had her arm wrapped around him from behind, contradicting her version of how the events preceding Gravley's killing unfolded. And although Murphy first claimed Gravley left "just to blow off some steam," he had a footlocker packed with personal items and clothing in his truck, indicating he was moving out for longer—another contradiction of her explanation of how events transpired that night. The jury could infer motive therefrom based on evidence that Murphy depended on Gravley as a source of income for her residence. Then there were the inconsistencies between Murphy's and Eller's statements to law enforcement, and the inconsistencies between those statements and the results of the investigation and autopsy. That evidence showed that the bedroom door was closed at the time of the killing, that the gunshot wound was inconsistent with an accident, and that Gravley's facial abrasions were consistent with him striking a hard surface when he fell after being shot—all of which contradicted Murphy's story that Eller suddenly rushed through the open door to engage Gravley and that the gun accidentally

discharged during the ensuing struggle as they fell on the bed. Also relevant was Murphy's reaction to the news of Gravley's death.

These facts are different than those of *Bullard v. State*, 263 Ga. 682 (436 SE2d 647) (1993), on which Murphy relies heavily. Although the girlfriend in *Bullard* initially lied to police about the killing committed by her co-defendant, the evidence showed that she merely cooperated and concealed the victim's death out of fear of the shooter. See id. at 683-686. Here, on the other hand, the evidence of Murphy's presence at the time of the crime, her companionship with her brother, and her conduct before, during, and after the offense was sufficient to authorize a rational trier of fact to disbelieve Murphy's version of events as unreasonable and to find beyond a reasonable doubt that she was guilty of the crimes of which she was convicted. See *Jackson*, 443 U. S. at 318-319; *Navarrete*, 283 Ga. at 158.

## III.

Appellants next contend that the trial court committed reversible error by allowing the two alternate jurors to remain in the jury room during deliberations. Although we agree that it was error for the alternate jurors to be allowed to retire with the other jurors during deliberations, Appellants have not shown that they were harmed by this error.

OCGA § 15-12-171 provides that upon final submission of the case to the jury "the alternate jurors shall not retire with the jury of 12 for deliberation," and if the court deems it advisable that one or more of the alternate jurors be kept available, they shall be kept "separate and apart from the regular jurors, until the jury has agreed upon a verdict." "If an alternate juror does, in fact, sit in on the jury's deliberations over the defendant's objections," then "there is a presumption of harm to the defendant that the State must overcome by presenting affirmative evidence that the alternate juror did not participate in deliberations and that the jury was not influenced by the alternate juror's presence." *London v. State*, 260 Ga. App. 780, 781 (580 SE2d 686) (2003) (citing *State v. Newsome*, 259 Ga. 187, 188 (378 SE2d 125) (1989) and *Johnson v. State*, 235 Ga. 486, 494-495 (220 SE2d 448) (1975)).

The State showed harmlessness at the motion for new trial hearing by submitting affidavits from all 12 jurors and both alternates. The affidavits stated that the alternates followed the trial court's instructions while in the jury room and did not participate in jury deliberations and that the jurors were not influenced by the alternates. See *Newsome*, 259 Ga. at 187 (harmless error because affidavits of all 12 jurors showed alternate juror did not affect any juror or jury's verdict); *Johnson*, 235 Ga. at 494-495 (harmless error because

State presented affidavits of all 12 jurors and the alternate juror demonstrating that alternate did not influence jury).

In any event, both Appellants waived any claim of error. When the trial court asked the attorneys about the alternate jurors, Eller's trial counsel stated, "I don't have a problem with them going back with the jury as long as they're instructed not to say anything." Although Murphy's trial counsel initially said that he did not want the alternates to go into the jury room during deliberations, when the trial court advised him that it would either permit the alternates in the jury room with instructions not to participate or "[i]f you don't want them in the jury room, I'll certainly respect that, but I'll have them sit in another room," Murphy's trial counsel replied "that's fine, Your Honor, to go back to the jury room with instructions" not to participate. See *Chandler v. State*, 309 Ga. App. 611, 614 (710 SE2d 826) (2011) ("[W]here defense counsel agreed to the alternate juror's presence during deliberations, any error is waived."); *London*, 260 Ga. App. at 782 ("[C]ounsel's consent to the arrangement waives this error."). We should be clear, however, that the trial court's action was inappropriate, and we do not approve of permitting alternate jurors to be present during deliberations. To do so is plainly contrary to Georgia law. See OCGA § 15-12-171.

IV.

Appellants next contend that their trial counsel were ineffective for acquiescing to the alternate jurors remaining with the jury during deliberations, failing to object to the medical examiner's expert testimony suggesting that the shooting was not an accident, withdrawing a notice of intent to introduce evidence of Gravley's violent acts toward third parties, failing to object to inadmissible hearsay, failing to object to improper testimony about Murphy's pre-arrest silence, and failing to introduce a certified copy of a bond order requiring Gravley to have no contact with Murphy. We disagree.

To prevail on an ineffective assistance of counsel claim, a defendant must show that his counsel's performance was professionally deficient and that such deficient performance resulted in prejudice to the defendant. *Strickland v. Washington*, 466 U. S. 668, 687-695 (104 SCt 2052, 80 LE2d 674) (1984); *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010). To satisfy the first prong, deficient performance, a defendant must show that his attorney "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Romer v.*

*State*, 293 Ga. 339, 344 (745 SE2d 637) (2013); see also *Strickland*, 466 U. S. at 687-688. This requires a defendant to "overcome the 'strong presumption' that counsel's performance fell within a 'wide range of reasonable professional conduct,' and that counsel's decisions were 'made in the exercise of reasonable professional judgment.'" *Simmons v. State*, 299 Ga. 370, 375 (788 SE2d 494) (2016) (citation omitted). To satisfy the second prong, prejudice, the defendant must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different. *Strickland*, 466 U. S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "If an appellant fails to meet his or her burden of proving either prong of the *Strickland* test, the reviewing court does not have to examine the other prong." *Lawrence v. State*, 286 Ga. 533, 533-534 (690 SE2d 801) (2010). We review each of Appellants' claims of ineffectiveness below.

A. *Failing to object to alternate jurors remaining with the jury during deliberations*.

As established above, even if Appellants' trial counsel had objected to the presence of the alternate jurors in the jury room during deliberations, the State submitted affidavits from all of the jurors demonstrating harmlessness.

Appellants cannot, therefore, show that they were prejudiced, so this claim of ineffective assistance fails.

B. *Failing to object to expert testimony that the gunshot wound was inconsistent with an accident.*

In criminal proceedings, expert witnesses "testifying with respect to the mental state or condition of an accused" cannot "state an opinion or inference as to whether the accused did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto" because "[s]uch ultimate issues are matters for the trier of fact alone." OCGA § 24-7-704 ("Rule 704"). But "the opinions of experts on any question of science, skill, trade, or like questions shall always be admissible; and such opinions may be given on the facts as proved by other witnesses." OCGA § 24-7-707 ("Rule 707").

Because Rule 704 is modeled on the Federal Rules of Evidence, we interpret it by looking "to decisions of the federal appellate courts construing and applying the Federal Rules, especially the decisions of the United States Supreme Court and the Eleventh Circuit." *Glenn v. State*, 302 Ga. 276, 280 (806 SE2d 564) (2017) (citation and punctuation omitted); see also *Davis v. State*, 299 Ga. 180, 185 (787 SE2d 221) (2016); *State v. Frost*, 297 Ga. 296,

299 (773 SE2d 700) (2015). Rule 707, however, was carried over from our former rule of evidence OCGA § 24-9-67, so when interpreting it we "may rely on Georgia decisions under the old Code." *Jones v. State*, 299 Ga. 40, 42 n.2 (785 SE2d 886) (2016) (quoting *Frost*, 297 Ga. at 299).

We have repeatedly held that under former OCGA § 24-9-67, expert testimony regarding whether a victim's injuries were inconsistent with an accident was admissible even when a defendant presented an accident defense, so long as the expert's determination was "beyond the ken of the jury"—in other words, beyond what most laypersons would be able to evaluate based on their independent knowledge. *McFolley v. State*, 289 Ga. 890, 893 (717 SE2d 199) (2011); see *Dyer v. State*, 295 Ga. 173, 177 (758 SE2d 301) (2014). That kind of evidence, therefore, continues to be admissible under Rule 707, unless and except as altered by the passage of Rule 704. But we see no conflict between the two rules, at least with regard to this issue, and Appellants point to no federal authority indicating that Rule 704 should be interpreted to exclude an expert's opinion, based on specialized knowledge and training, that the characteristics of certain injuries are inconsistent with being accidental.

Indeed, the Eleventh Circuit has noted that "[t]he operative language of 704(b) says that an expert may not '*state* an opinion or inference as to whether

the *defendant* did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto.'" *United States v. Alvarez*, 837 F2d 1024, 1031 (11th Cir. 1988) (quoting Fed. R. Evid. 704 (b)) (emphasis in original). In other words, "the expert cannot expressly state a conclusion that the defendant did or did not have the requisite intent." Id. Our Rule 704 (b) likewise provides that an expert may not "state an opinion or inference as to whether *the accused* did or did not have the mental state or condition constituting an element of the crime charged or of a defense thereto." (emphasis supplied). We agree with the Eleventh Circuit, therefore, that the rule forbids experts from expressly stating a conclusion that the accused did or did not have the requisite intent. Whether *the accused* committed an intentional act to harm the victim is a different question than whether *someone* likely committed an intentional act to harm the victim.

Because the medical examiner's testimony that Gravley's injuries were inconsistent with an accidental shooting did not supply or mandate a conclusion that Appellants did or did not have the requisite mental intent for any crime or defense, there was no violation of Rule 704. And because the expert's opinion was based on her specialized knowledge and training, as permitted by Rule 707, her testimony was admissible and any objection to it

would have been meritless.  See *Wesley v. State*, 286 Ga. 355, 356 (689 SE2d 280) (2010) (counsel not ineffective for failing to make meritless objection).  Accordingly, this second claim of ineffective assistance of trial counsel also fails.

C. *Withdrawing notice of intent to introduce evidence of Gravley's violent acts toward third parties.*

Appellants next contend that their trial counsel were ineffective for withdrawing a notice of intent to introduce evidence of Gravley's violent acts toward third parties.  But we have previously held that "as a general rule, character evidence of a victim is limited to reputation or opinion, *not* specific bad acts."  *Mohamud v. State*, 297 Ga. 532, 536 (773 SE2d 755) (2015) (emphasis in original).  Appellants themselves acknowledge that, at best, the question of whether there should be an exception to the general rule which would "allow specific acts of evidence of a victim's violent disposition of which the defendant had personal knowledge to show the defendant's state of mind" was "left open" by this Court in *Mohamud*.  Id. at 536 n.2 (citation and punctuation omitted).  That dooms their claim because in general, "trial counsel's performance cannot be deemed deficient for not raising an unsettled

question of law." *Williams v. State*, 302 Ga. 474, 482 (807 SE2d 350) (2017). This claim of ineffective assistance also fails.

D. *Failing to object to hearsay.*

Appellants also contend that their trial counsel were ineffective for failing to object, on hearsay grounds, to testimony elicited by the State on its re-cross examination of a defense witness. The witness had stated that during a prior domestic incident between Gravley and Murphy, Gravley said he struck Murphy to disarm her because she was holding a toy gun on him that he thought was real. But when asked about this testimony at the motion for new trial hearing, Appellants' trial counsel testified that they did not object to the testimony because Gravley's admission that he hit Murphy was consistent with their trial strategy and showed that in "Mr. Gravley's own words, something aggressive [was] going on." "Reasonable decisions as to whether to raise a specific objection are ordinarily matters of trial strategy and provide no ground for reversal." *Ballard v. State*, 297 Ga. 248, 254 (773 SE2d 254) (2015) (citation and punctuation omitted). We do not find that counsel's strategy here fell outside the wide range of reasonable professional performance.

E. *Failing to object to testimony on Murphy's pre-arrest silence*.

Appellants also contend that trial counsel were ineffective for failing to object to Sergeant Rogers's testimony that when he asked Murphy to look at suspected bloodstains on her vehicle she "could not offer any kind of explanation, did not say anything." Appellants argue that this testimony was an improper comment on Murphy's pre-arrest silence in violation of our holding in *Mallory v. State*, 261 Ga. 625, 629-630 (409 SE2d 839) (1991).

But as we recognized in *Wright v. State*, 300 Ga. 185, 186 n.2 (794 SE2d 105) (2016), the rule set forth in *Mallory*, which was based not on constitutional grounds, but on former OCGA § 24-3-36, applied to trials held **before** January 1, 2013—the effective date of our new Evidence Code. See also *Kennebrew v. State*, 299 Ga. 864, 872 n.4 (794 SE2d 695) (2016). We have specifically declined thus far to decide whether *Mallory* applies in trials after January 2013. *Kennebrew*, 299 Ga. at 872 n.4; *Simmons*, 299 Ga. at 374. The admissibility of this testimony being "subject to reasonable dispute," *Simmons*, 299 Ga. at 374 (citation and punctuation omitted), we again decline to find deficient performance based on trial counsel's failure to object under an "unsettled question of law." *Williams*, 302 Ga. at 482.

F. *Failing to introduce a certified copy of a no-contact order*.

Appellants' last contention is that trial counsel were deficient for failing to introduce a certified copy of a prior no-contact bond order stemming from the domestic incident in which Gravley admitted striking Murphy.  But even assuming that trial counsel should have introduced the no-contact order, the jury heard multiple witnesses testify about this specific domestic incident, as well as other violent interactions between Gravley and Murphy.  Because the no-contact order would have been cumulative of other evidence presented to the jury, Appellants "cannot establish how counsel's performance, even if deficient, prejudiced [their] defense so as to support a claim of ineffective assistance of counsel."  *Gibson v. State*, 277 Ga. 486, 487 (591 SE2d 800) (2004).  This final claim of ineffective assistance also fails.

Judgment affirmed.  All the Justices concur.

Decided March 5, 2018 — Reconsideration denied March 29, 2018.

Murder. Bartow Superior Court. Before Judge Suzanne Smith.

Matthew K. Winchester, for appellants.

Rosemary M. Greene, District Attorney, Sharon M. Fox, Elizabeth M. York, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Aimee F. Sobhani, Assistant Attorney General, for appellee.