In the Supreme Court of Georgia

Decided:    July 5, 2016

S16A0253. SIMMONS v. THE STATE.

HINES, Presiding Justice.

Jermichael Simmons appeals from his convictions and sentences for malice murder, rape, and aggravated sodomy in connection with the death of Jennifer Sutton.  For the reasons that follow, we affirm.[1]

Construed to support the verdicts, the evidence showed that on Saturday, March 16, 2013, Sutton's body was found 50 feet from the road in an overgrown vacant lot in Swainsboro, Georgia.  Her jeans and underwear had been  pulled

[1] The crimes occurred on March 16, 2013.  On September 27, 2013, an Emanuel County grand jury indicted Simmons for malice murder, felony murder while in the commission of the crime of aggravated assault, felony murder while in the commission of the crime of violating the Georgia Controlled Substances Act, rape, and aggravated sodomy.  On March 13, 2014, Simmons moved to quash the count of the indictment that charged him with felony murder while in the commission of the crime of violating the Georgia Controlled Substances Act; the court granted the motion on April 4, 2014, and a redacted indictment was prepared.  Simmons was tried before a jury April 14-16, 2014 and found guilty of all remaining charges.  On April 22, 2014, Simmons was sentenced to life in prison for malice murder and concurrent sentences of 25 years in prison for the rape and aggravated sodomy charges; the charge of felony murder while in the commission of the crime of aggravated assault was vacated by operation of law.  See Malcolm v. State, 263 Ga. 369, 371-374 (4), (5) (434 SE2d 479) (1993).  Simmons filed a motion for new trial on April 30, 2014, which he amended on April 14, 2015; on July 6, 2015, the motion, as amended, was denied.  Simmons filed a notice of appeal on July 20, 2015, the appeal was docketed in this Court for the January 2016 term, and submitted for decision on the briefs.

down to her knees and the shirts she was wearing had been pulled up to her chest. Blood had come from her mouth, where it appeared that she had been struck; she had been choked and asphyxiation was the cause of death.

During the early hours of March 16, 2013, Sutton and Simmons entered Billy Scott's home near the vacant lot and asked to use a bedroom to smoke illegal drugs, which Scott permitted; Scott knew Sutton, but not Simmons. Simmons and Sutton stayed in the room for thirty minutes to an hour, during which time Scott heard them arguing; when Simmons left Scott's home, Sutton followed him out, and continued to follow him as he walked down the road, exclaiming after him, "you shit me." A used condom was found in the bedroom, which contained Simmons's DNA; examination of Sutton's vaginal and rectal areas also produced Simmons's DNA.

Over three months after the death, Simmons came to the attention of law enforcement officers, and an investigator contacted Simmons through his mother. Simmons went to the Swainsboro Police Department to be interviewed, and stated that he lived in North Carolina, but frequently visited his relatives in the area. Simmons first stated that he had known Sutton from previous sexual encounters, came upon her while walking on the street in the early morning

hours of March 16, 2013, and chatted with her; she indicated that she was looking to "make some money" by selling sexual favors, but Simmons was not interested, as his fiancé was staying with him at his sister's apartment nearby, that another man came upon them while they were chatting, and Simmons left Sutton and the man together and walked to his sister's apartment. Upon further questioning, Simmons admitted that Sutton took him to a nearby house where he had sexual relations with her, but when he did not pay her, she angrily followed him down the street seeking money. Simmons admitted that he was also angry as he had not had to pay her for sex in the past, and in trying to keep her from grabbing at him and pulling on his shirt, he pushed her to the ground; although he stated that he helped her back to her feet, later during the interview, he stated that Sutton continued to fall to the ground, apparently unconscious. Simmons stated that as she was lying in the road, he pulled her to the side of it, at which time her shirts rose to her chest; he denied pulling her jeans down, or hitting or choking her. Simmons stated that he then walked to his sister's apartment; in response to a question as to why he did not call someone to help Sutton, he replied that he thought she was not badly hurt, would simply wake up, and did not want to arouse any suspicion on the part of his fiancé. He also

3

stated that the next day, he watched from his sister's apartment as the police processed the crime scene around Sutton's body, and knew that they would eventually want to talk to him.

1. The evidence authorized the jury to find Simmons guilty beyond a reasonable doubt of the crimes of which he was convicted. *Jackson v. Virginia*, 443 U.S. 307 (99 SCt 2781, 61 LE2d 560) (1979).

2. Simmons notes that during its opening statement, the State alluded to the fact that, after leaving Sutton's body in a vacant lot, he "[called] no one. Not one single person." He also points out that during its closing argument, the State alluded to Simmons's failure to come forward during the investigation of Sutton's killing[2] and that, during the State's case-in-chief, it presented testimony from the primary investigator that Simmons failed to come forward with the information that he had sex with Sutton the night she was killed.[3] Simmons

---

[2] The prosecutor said: "He watched as they state, from afar, because he knew what he had done. He left because he knew what he had done. He never stepped forward until he was found by [the primary investigator.]"

[3] The following exchange took place during the State's direct examination of the investigator:

Q: Well after he became a suspect did you talk to him?
A: I did, yes, sir.
Q: Now, during the couple of months that went by during this period did he contact you in any way during that time?

contends that these were instances of improper comment upon his silence. However, Simmons did not raise any timely objection below so as to allow the trial court to take any appropriate remedial action. See *Mullins v. State*, 270 Ga. 450 (2) (511 SE2d 165) (1999). See also OCGA § 24-1-103 (a) & (b). Thus, as to the remarks made in the State's opening statement and closing argument,

> [i]nasmuch as there was no contemporaneous objection made, th[ese] allegation[s] of error ha[ve] not been preserved for review on appeal. See *Phillips v. State*, 285 Ga. 213 (3) (675 SE2d 1) (2009). Also, there is no authority for the application of plain error review to comments made by lawyers during opening statements [or closing argument.] Rather, we apply plain error review to the trial court's jury instructions (see OCGA § 17–8–58 (b)) and to the trial court's rulings on evidence. See OCGA § 24–1–103 (d). Opening statements [and closing arguments] are neither instructions by the trial court nor evidence. Accordingly, in the absence of an objection, th[ese] allegation[s] of error will not be considered by the Court.

*Crayton v. State*, 298 Ga. 793, 794 (2) (784 SE2d 343) (2016) (Footnote omitted.)

Regarding the cited testimony of the investigator under our plain error

---

A: No, sir.
Q: Did you have to-in order to talk to him, did you have to call him or did he call you?
A: I had to locate Mr. Simmons.
Q: And so he never called you to tell you that he was with her?
A: No, sir.
Q: Never called you to tell you that he had sex with her?
A: No sir.

review, this Court has previously stated the test for a finding of plain error.

> First, there must be an error or defect—some sort of deviation from a legal rule—that has not been intentionally relinquished or abandoned, i.e., affirmatively waived, by the appellant. Second, the legal error must be clear or obvious, rather than subject to reasonable dispute. Third, the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the trial court proceedings. Fourth and finally, if the above three prongs are satisfied, the appellate court has the discretion to remedy the error—discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings. [Cit.]

*Cheddersingh v. State*, 290 Ga. 680, 683 (2) (724 SE2d 366) (2012).  See also

*Jones v. State*, ___ Ga. ___, ___ (2) (___ SE2d ___) (2016) (Case No. S16A0498, decided May 9, 2016).  See also OCGA § 24–1–103 (a) & (d).[4]

Simmons cites *Mallory v. State*, 261 Ga. 625 (406 SE2d 839) (1991) (overruled on other grounds, see *Clark v. State*, 271 Ga. 6 (515 SE2d 155) (1999)), for the proposition that Georgia has a "bright-line" rule against admission of evidence of a defendant's "failure to come forward," except in

---

[4] OCGA § 24–1–103 reads in pertinent part:

(a) Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . .

(d) Nothing in this Code section shall preclude a court from taking notice of plain errors affecting substantial rights although such errors were not brought to the attention of the court.

limited circumstances. Pretermitting whether *Mallory* established such a rule that governs Simmons's situation, he cannot rely upon that rule to demonstrate that it was plain error for the trial court to allow the unobjected-to testimony to be given. This Court has repeatedly noted that *Mallory* was decided on the basis of former OCGA § 24–3–36, a provision that has been repealed by the enactment of the new Evidence Code, which became effective January 1, 2013 and applied to Simmons's trial in 2014. See *Seabolt v. Norris*, 298 Ga. 583, 587 (n. 3) (783 SE2d 913) (2016); *State v. Sims*, 296 Ga. 465, 471 (3) (769 SE2d 62) (2016); *Wilson v. State*, 295 Ga. 84, 88 (fn. 6) (2014); *Romer v. State*, 293 Ga. 339, 343 (n. 4) (745 SE2d 637) (2013); *Yancey v. State*, 292 Ga. 812, 817 (n. 9) (740 SE2d 628) (2013). In doing so, we have taken pains to note that this Court "express[ed] no opinion about the continuing validity of *Mallory* under the new Evidence Code." *Sims*, supra. See also *Seabolt*, supra; *Wilson*, supra; *Romer*, supra; *Yancey*, supra. As such, it is not possible to say that for the trial court to permit the testimony at issue was a legal error that was "clear or obvious, rather than subject to reasonable dispute." *Cheddarsingh*, supra. Rather, "[a]n error is plain if it is clear or obvious under current law. An error cannot be plain where there is no controlling authority on point . . .." *Wilson*,

supra at 460 (729 SE2d 364) (2012). Accordingly, whether the testimony at issue violated *Mallory* must be considered " 'subject to reasonable dispute' and thus cannot constitute plain error. [Cit.]" Id.

Simmons further asserts that the testimony at issue violated his right against self-incrimination under the Fifth Amendment to the Constitution of the United States, applicable to Georgia through the Fourteenth Amendment. See *Jenkins v. Anderson*, 447 U.S. 231, 235 (II) (100 SCt 2124, 65 LE2d 56) (1980) But again, Simmons fails to point to authority showing that admission of the testimony is clearly and obviously legal error of constitutional magnitude. Rather, it is clear that testimony about a defendant's failure to come forward is often admissible. Id. at 240 (III). Indeed, as in *Jenkins*,

> no governmental action induced [Simmons] to remain silent before arrest. The failure to speak occurred before [Simmons] was taken into custody and given *Miranda*[5] warnings. Consequently, the fundamental unfairness present in *Doyle*[6] is not present in this case.[7]

---

[5] *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966).

[6] *Doyle v. Ohio*, 426 U.S. 610 (96 SCt 2240, 49 LE2d 91) (1976), holding that to allow the use of the silence of a defendant after he received *Miranda* warnings to impeach that defendant's explanation subsequently offered at trial would violate due process as the *Miranda* warnings contain an implicit assurance that no penalty will result from silence.

[7] Simmons did not testify at trial, but recordings were played to the jury of his interviews with investigators, in which Simmons gave various versions of events prior to Sutton's death.

Id.  See also *Salinas v. Texas*, ___ U. S. ___ (133 SCt 2174, 186 LE2d 376) (2013), noting that the Fifth Amendment privilege against self-incrimination ordinarily must be invoked to protect silence, which Simmons had not done at the time of his failure to come forward.  Again, the absence of clear authority to support the proposition that Simmons advances prevents the establishment of plain error as to the admission of this evidence.  *Wilson*, supra.

3. Simmons contends that his trial counsel was ineffective in failing to object to the testimony and prosecutorial comments noted in Division 2, supra.  In order to prevail on a claim of ineffective assistance of counsel, Simmons must show both that counsel's performance was deficient, and that the deficient performance was prejudicial to his defense.  *Smith v. Francis*, 253 Ga. 782, 783 (1) (325 SE2d 362) (1985), citing *Strickland v. Washington*, 466 U.S. 668 (104 SCt 2052, 80 LE2d 674) (1984).  To meet the first prong of the required test, he must overcome the "strong presumption" that counsel's performance fell within a "wide range of reasonable professional conduct," and that counsel's decisions were "made in the exercise of reasonable professional judgment."  Id.  The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the particular circumstances of the case, id. at 784,

and decisions regarding trial tactics and strategy may form the basis for an ineffectiveness claim only if they were so patently unreasonable that no competent attorney would have followed such a course. *Redding v. State*, 297 Ga. 845, 850 (5) (778 SE2d 774) (2015). To meet the second prong of the test, he must show that there is a reasonable probability that, absent any unprofessional errors on counsel's part, the result of his trial would have been different. *Smith*, supra at 783. "'We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts.' [Cit.]" *Robinson v. State*, 277 Ga. 75, 76 (586 SE2d 313) (2003).

Assuming that the now-challenged testimony and comments were improper and could have been excluded from trial, see Division 2, supra, we note that Simmons waived a hearing on his amended motion for new trial, and thus "it is extremely difficult to overcome the strong presumption that counsel's performance was reasonable. [Cit.]" *White v. State*, 281 Ga. 276, 281 (6) (637 SE2d 645) (2006). But, even if Simmons could show that counsel's failure to object to the now-challenged testimony and comments was not in the pursuit of

10

a reasonable strategy,[8] see *Redding*, supra,

he fails to meet the second prong of the required test. Given the evidence against Simmons, which included the physical evidence, testimony regarding his argument with Sutton shortly before her death, and his own inconsistent statements regarding his behavior during and after that argument, there is no reasonable probability that the result of his trial would have been different, even if counsel had raised objections to the now-challenged testimony and comments. *Sanders v. State*, 290 Ga. 637, 641-642 (5) (723 SE2d 436) (2012).

Judgments affirmed. All the Justices concur.

---

[8] During closing argument, Simmons's counsel noted that Simmons admitted having sex with Sutton and that Simmons's fiancee said he returned to his sister's home at a time at which a defense witness's testimony was that Sutton was still alive. Counsel argued that as other men were in the area at the time Sutton died, the DNA of an unidentified man was found in Sutton's mouth, and Simmons had not paid her for sex, Sutton still needed to procure money, would do so in exchange for sex, and there was ample opportunity for another man to come upon Sutton, engage in oral sex, and kill her. Counsel also asserted that individuals "in the world [Sutton] was living in . . . look the other way, they don't speak up . . . [t]he police have to come to them" and ask specific questions.