**FOURTH DIVISION**
**DILLARD, P. J.,**
**RICKMAN and BROWN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**October 28, 2020**

# In the Court of Appeals of Georgia

A20A0882. BULLY v. STATE.

RICKMAN, Judge.

Following the denial of his motion for new trial, Jeffery Bully appeals his convictions on multiple counts of rape and other crimes, including five counts of sexual assault on a probationer by an agent of a probation office under former OCGA § 16-6-5.1 (b) (2). On appeal, Bully raises several enumerations of error, including that the evidence was insufficient to show that he was the agent of a probation office for purposes of OCGA § 16-6-5.1 (b) (2), that the evidence was insufficient to support two specific convictions of rape, that the trial court erred in taking certain safety measures and in a jury charge, and that his trial counsel provided ineffective assistance. For the reasons that follow, we reverse the convictions of sexual assault

on a probationer, affirm the remaining convictions, vacate the sentence, and remand this case for resentencing.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." (Citation and punctuation omitted.) *Maddox v. State*, 346 Ga. App. 674, 675 (816 SE2d 796) (2018).

So construed, the evidence shows that in 2014, Bully owned and operated Rise Above Recovery (hereinafter "RAR"), an in-patient drug rehabilitation facility.[1] Criminal defendants, particularly those convicted of drug crimes, are often required to complete a drug rehabilitation program as a condition of probation, and RAR provided such program. RAR was not accredited by an industry association, and was not otherwise licensed by the State to provide such services.[2]

Bully routinely made sexual advances towards women in the RAR program, including probationers. He repeatedly threatened to expel or report probation violations on female probationers unless the probationer agreed to engage in sexual

---

[1] Bully described RAR as a "sober living environment."

[2] Programs can be sanctioned by the State based on their merits and agreement to "follow certain programming guidelines." Some courts refuse to order probationers to attend unaccredited programs such as RAR.

2

activities with him. For those probationers who agreed to have sexual relations with him, he would often reduce account charges[3] or offer some other financial exchange. Eventually some of the probationers spoke out and an investigation led to charges against Bully for crimes against seven victims.

One of the victims, M. T., testified that while participating in the RAR program under a court order, Bully raped her in the woods near his house. She testified that she did not scream out because she knew Bully had the power to send her back to jail. M. T. had reported to another RAR client that Bully held her down and forced her have sex. DNA testing confirmed that Bully had engaged in sexual intercourse with M. T. Bully was convicted of rape and sexual assault of a probationer for his acts involving M. T.

The second victim, A. D., testified that while participating in the RAR program under a court order, Bully sexually harassed her and had sex with her against her will. Bully was convicted of sexual assault of a probationer for his acts involving A. D.[4]

---

[3] The probationers were personally responsible for paying the fees for the program at RAR.

[4] The jury acquitted Bully on the count of rape of A. D.

Bully's third victim, M. F., testified that while participating in the RAR program under a court order, Bully forced her to give him oral sex against her will upon threat of not being allowed leave to visit her children and, on a separate occasion, forced her to have sex with him. She told others that Bully had sexually assaulted her upon a threat of going back to jail. Bully was convicted of rape, aggravated sodomy, and sexual assault of a probationer for his conduct involving M. F.

Bully's fourth victim, R. W., testified that while participating in the RAR program under a court order, Bully offered to reduce her program fees if she agreed to perform sexual favors for him, threatened to discharge her from the program if she refused to perform oral sex, and made unwanted sexual contact with her by slapping her on the butt on multiple occasions. Bully was convicted of sexual battery and sexual assault of a probationer for his conduct involving R. W.

Bully's fifth victim, S. R. L., testified that while participating in the RAR program under a court order, Bully twice forced her to have sex with him over her

4

protests. Bully was convicted of rape and sexual assault of a probationer for his conduct involving S. R. L.[5]

At trial, the State introduced six witnesses pursuant to OCGA § 24-4-413 ("Rule 413") to testify about similar sexual assaults by Bully. The State also offered the testimony of multiple probation officers from various jurisdictions who were assigned to supervise one or more of the victims under the above-referenced court orders.

Bully testified in his own defense and admitted having sexual intercourse with M. T. and A. D. but claimed the contact was consensual.

In sum, Bully was convicted on five counts of sexual assault of a probationer, three counts of rape, one count of aggravated sodomy, and one count of sexual battery; the convictions involved five victims. Following the denial of his motion for new trial, Bully appeals.

1. Bully first contends the evidence was insufficient to convict him on the five counts of sexual assault on a probationer under the version of OCGA § 16-6-5.1 (b)

---

[5] The State dismissed the charges regarding the remaining two victims during the trial.

(2) in effect at the time of the underlying events. See Ga. L. 2010, p. 168, § 2.[6] Specifically, he argues that the evidence was insufficient to establish that he was an employee or agent of any probation or parole office. We agree.

When evaluating the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." (Citation and emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

Under former OCGA § 16-6-5.1 (b) (2), sexual contact with a probationer by employees or agents of probation or parole offices was forbidden:

> A person who has supervisory or disciplinary authority over another individual commits sexual assault when that person . . . *[i]s an employee or agent of any probation or parole office* and engages in sexual contact with such other individual who the actor knew or should have known is a probationer or parolee under the supervision of the same probation or parole office.

---

[6] The Code section has been revised multiple times since the time of the crimes. See OCGA § 16-6-5.1.

(Emphasis supplied.)[7] There is no evidence that Bully was an employee of a probation office. Accordingly, the State was required to show that Bully was the agent of a probation office.

Georgia law provides that "[t]he relation of principal and agent arises wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf." OCGA § 10-6-1; see also *Hutchens v. State*, 174 Ga. App. 507, 508 (1) (330 SE2d 436) (1985) (applying OCGA § 10-6-1 in a criminal case).[8] "Agency can be either express or implied and can arise from, or be inferred from, any of a number of circumstances." *Hutchens*, 174 Ga. App. at 508 (1). "The fact of agency may be established by proof of circumstances, apparent relations, and the conduct of the parties." (Citation and punctuation omitted.) *Collins v. Martin*, 157 Ga. App. 45, 46 (2) (276 SE2d 102) (1981). An agent is authorized to act for another "when, expressly or impliedly, there has been a delegation with more or less discretionary power to act, to manage an

---

[7] Consent of the victim was not a defense to the crime of sexual contact with a probationer by employees or agents of probation or parole offices. See OCGA § 16-6-5.1 (e) (2010).

[8] The term "agent" was not defined in OCGA § 16-6-5.1 at the time, although the statute has since been revised and now "agent" is statutorily defined. See Ga. L. 2010, p. 168, § 2.

affair, and to render an account." (Citations omitted.) *Headrick v. Fordham*, 154 Ga. App. 415, 417 (1) (268 SE2d 753) (1980). Finally, when construing what constitutes an agent under OCGA § 16-6-5.1 (b) (2), we note that "[c]riminal statutes are construed strictly against the State, they must be read according to the natural and obvious import of their language, and their operation should not be limited or extended by application of subtle and forced interpretations." (Citation omitted.) *Perkins v. State*, 277 Ga. 323, 325-326 (2) (588 SE2d 719) (2003).

Here, the record evidence establishes that there was no agency relationship between RAR and/or Bully and any probation office. The record is devoid of evidence of a written or oral agreement between RAR and/or Bully and any probation office or any state agency; devoid of evidence that any probation office ever expressly requested that RAR and/or Bully perform a service or function on its behalf; devoid of evidence that RAR and/or Bully operated according to any state-issued guidelines; and devoid of evidence that any probation office gave direction or instruction to RAR and/or Bully in any way as to how to run the drug rehabilitation program, treat the probationers, or determine when a probation violation had occurred. Rather, the only relevant evidence showed the opposite. A probation officer who supervised two of the probationers at RAR testified that she had never visited RAR, never

8

communicated with Bully, and never instructed RAR and/or Bully as to any expectations of them on behalf of the probation office. None of the other probation officers testified to the contrary. Thus, the State failed to present any evidence that RAR and/or Bully were authorized to act as an agent for any probation office. See *Atlanta Market Center Mgmt., Co. v. McLane*, 269 Ga. 604, 606 (1) (a) (503 SE2d 278) (1998) (no agency relationship where no evidence was presented that purported agent was authorized to act on principal's behalf).

In support of its position that Bully was an agent of a probation office subject to OCGA § 16-6-5.1 (b) (2), the State relied on the fact the probation offices received reports from RAR about the status of its probationers in the program, and their compliance with the RAR recovery program.[9] The probation officers testified that they relied on and trusted these reports. But the State did not present any evidence that probation offices instructed RAR to produce such reports, and regardless, such reporting alone does not determine agency. Cf. *New Star Realty v. Jungang PRI USA*, 346 Ga. App. 548, 555 (1) (a) (816 SE2d 501) (2018) (that franchisee was required to make periodic reports to franchisor did not demand a finding of an agency

---

[9] These reports typically included verification of residency, monthly progress reports, drug test reports, and discharge reports.

relationship between franchisor and franchisee). Moreover, in the event that RAR did report that a probationer had failed to comply with its program, RAR and/or Bully lacked the authority to address the violation outside of RAR's own program requirements. The probation officer and the court, not RAR or Bully, would determine what, if any, action should be taken with respect to the probationer's probation status. As explained by a State witness, once RAR sent a report of bad behavior to a probation officer,

> The probation officer can then take that information to the judge who assigned this person to be on probation and the judge can revoke their probation, say that you're not in compliance with the terms of your probation, and when the judge revokes your probation, you go back to jail.

Several probation officers also testified that they have some discretion in determining whether a reported violation will trigger the officer to seek a revocation of probation. Thus, although RAR and/or Bully had authority to control the RAR program, there is no evidence that RAR was required – or authorized – to enforce or implement any rules or instructions dictated by any probation office.[10]

_____

[10] The State also relies on case law cited by the trial court in both its charge to the jury and in its order denying Bully's motion for new trial. See *Belvin v. State*, 221 Ga. App. 114, 115 (470 SE2d 497) (1996) ("'probation officer' [is] an officer

10

In sum, the evidence was insufficient to establish that Bully was the agent of any probation office. See OCGA § 10-6-1. Thus, the evidence failed to establish that Bully committed the crime of sexual assault on a probationer by an agent of a probation office under former OCGA § 16-6-5.1 (b) (2). See generally *State v. Hammonds*, 325 Ga. App. 815, 818 (755 SE2d 214) (2014) (holding that under former OCGA § 16-6-5.1, the legislature chose to specify the classification of individuals who may be prosecuted for sexual assault under the statute, and it is limited to its language). Accordingly, Bully's convictions on Counts 2, 4, 6, 9, and 12 are reversed.

2. Bully contends the evidence was insufficient to convict him of aggravated sodomy on M. F. He argues specifically that there was no evidence of force. He does not challenge his conviction of raping M. F., an event that occurred a number of days after the aggravated sodomy.

------

appointed to keep under supervision and to report on a convicted offender who is free on probation") (punctuation omitted.) But the Court in *Belvin* was interpreting an earlier version of OCGA § 16-6-5.1 which defined the crime as one committed by "[a] probation or parole officer." Id. Those words were not included in the version of the statute applicable to the claims herein. See Ga. L. 2010, p. 168, § 2. Further, there is no evidence that Bully was an "officer" of any kind.

"A person commits the offense of [aggravated] sodomy when he or she performs or submits to any sexual act involving the sex organs of one person and the mouth or anus of another. . . with force and against the will of the other person." OCGA § 16-6-2 (a). The term "force" in the context of sexual offenses means "acts of physical force, threats of death or physical bodily harm, or mental coercion, such as intimidation" such as would be "sufficient to instill in the victim a reasonable apprehension of bodily harm, violence, or other dangerous consequences to (oneself) or others." (Citation and punctuation omitted.) *Watson v. State*, 293 Ga. 817, 821 (2) (750 SE2d 143) (2013). "The term 'against her will' means without consent." *State v. Collins*, 270 Ga. 42, 43 (508 SE2d 390) (1998). For this element, "[t]he question is whether the [S]tate has proved, beyond a reasonable doubt, that the acts of the accused were not freely consented to by the alleged victim." *Clark v. State*, 261 Ga. 311, 311 (404 SE2d 787) (1991).

M. F. testified that Bully took her down a trail in a field near his house where he asked her to give him oral sex. Bully told her that she had to do as he wished if she wanted to see her children at Thanksgiving. She believed that she did not have a choice and, therefore, acquiesced to his demands. A witness testified that M. F. told him that Bully had forced her to give him oral sex. M. F. told her probation officer

12

that she had been sexually assaulted at RAR "under threat of . . . return to custody." And Bully and other witnesses admitted that it was Bully who decided when and if a probationer was permitted to leave the RAR program.

This evidence was sufficient to show that M. F. submitted to oral sex with Bully as a result of mental coercion or intimidation. See *Eller v. State*, 294 Ga. App. 77, 79 (2) (668 SE2d 755) (2008) (evidence of force present where defendant threatened to kill victim if she did not have oral sex with him); *Dasher v. State*, 281 Ga. App. 326, 328 (636 SE2d 83) (2006) (lack of resistance when defendant posed as a police officer and drove victims to remote locations where aid was unlikely authorized a finding of force). Accordingly, the evidence was sufficient to sustain the conviction. See *Schneider v. State*, 267 Ga. App. 508, 510 (1) (603 SE2d 663) (2004).

3. Bully contends the evidence was insufficient to convict him of raping S. R. L. "A person commits the offense of rape when he has carnal knowledge of. . . [a] female forcibly and against her will." OCGA § 16-6-1 (a) (1). He again contends there was no evidence to support a finding of force.

The victim testified that she was a recovering addict on probation from an eight-year sentence and that Bully told her he could do anything he wanted with her because he got her out of that sentence. Bully sent her to clean a washer and dryer in

13

a trailer. Bully arrived five minutes later, took her to a sofa and said, "let's have sex." She told him "no" two or three times, and testified that she did not want to have sex. She nevertheless testified that he was "very insistent," would not take no for an answer, and pulled down her pants. At that point, the victim testified that she did not feel as though she could avoid it, and with his body on top of hers, he had sex with her. Another RAR client testified that S. R. L. had told her that Bully "pushed her over the dryer and had sex with her there." Construing the evidence and inferences arising therefrom in the light most favorable to the jury's finding of guilt, any rational trier of fact could have found the essential elements of rape beyond a reasonable doubt. See *Roberts v. State*, 313 Ga. App. 849, 850 (1) (723 SE2d 73) (2012) (evidence of rape sufficient where defendant "held down [victim's] hands as she tried to push him away, and had sexual intercourse with her as she screamed, telling him 'no' and 'stop.'"); see also *Mack v. State*, 338 Ga. App. 854, 857 (1) (792 SE2d 120) (2016) ("It was up to the jury, not [the defendant] or this Court, to determine the credibility of the victim's testimony as to lack of consent and whether she did not resist because she was intimidated.").

4. Bully contends that the trial court erred by admitting extrinsic evidence of other crimes of sexual assault under OCGA § 24-4-413 (a) ("Rule 413"). That statute provides:

> In a criminal proceeding in which the accused is accused of an offense of sexual assault, evidence of the accused's commission of another offense of sexual assault shall be admissible and may be considered for its bearing on any matter to which it is relevant.

Under this statute, "a trial court's decision to admit other acts evidence will be affirmed if a jury could find by a preponderance of the evidence that the defendant committed the act." (Citation and punctuation omitted.) *Latta v. State*, 341 Ga. App. 696, 701 (2) (802 SE2d 264) (2017).

Bully contends that the trial court improperly admitted the testimony of four of six Rule 413 witnesses — K. B., C. M., H. S., and A. Y. — because the evidence presented failed to show that these four witnesses suffered an "offense of sexual assault" by Bully as required under the statute. He primarily asserts that the evidence failed to show force or lack of consent as to any of the sexual acts about which they testified.[11]

---

[11] Bully does not argue that this evidence should have been excluded under OCGA § 24-4-403.

15

The term "offense of sexual assault" is defined to include "any conduct or attempt or conspiracy to engage in" rape, sodomy and aggravated sodomy, sexual assault on a probationer by an agent of a probation office,[12] sexual battery, aggravated sexual battery, and any other crime that involves sexual contact without consent. See OCGA § 24-4-413 (d).[13] Some of these crimes require both a showing of force and a lack of consent; some only require a showing of lack of consent.[14]

(a) K. B. testified that she became a client of a predecessor to RAR operated by Bully when she was required to complete a drug and alcohol treatment program as a part of a probationary sentence. Bully, whom she had never met, picked her up

---

[12] Because we have held that there was insufficient evidence to show that Bully was an agent of a probation office for the purposes of former OCGA § 16-6-5.1 (b) (2), no prior act asserting that crime alone should have been admitted against him under Rule 413.

[13] This Code section became effective in 2013, and it provides that it "shall not be the exclusive means to admit or consider evidence described in this Code section." OCGA § 24-4-413 (c).

[14] Rape and aggravated sodomy (two of the crimes for which Bully was convicted), require proof that the defendant acted both with force and against the will of the victim, two separate elements. See OCGA §§ 16-6-1 (a) (1); 16-6-2 (a) (2); see also *State v. Collins*, 270 Ga. 42, 42 (508 SE2d 390) (1998); *Thurmond v. State*, 353 Ga. App. 506, 508 (838 SE2d 592) (2020). Sexual battery and aggravated sexual battery do not require a showing of force but do require proof of lack of consent. See OCGA §§ 16-6-22.1; 16-6-22.2.

16

from the jail and took her straight to a hotel room. She explained that she "knew what was going to happen . . . I mean, coming from doing drugs and being a stripper and being a prostitute and stuff like that, you just know." At some point, "[Bully] made his advances; he started touching me and kissing me and then it was oral sex and then we had sex." When asked why she never said no, she replied, "Because this is the man who just came and got me out of jail and I'm going to his rehab." She understood that he had authority over her and that if she did not cooperate, she would get kicked out of the program and have to go back to jail. She testified that "if you say no, then things are just going to get really bad for you." She and Bully, who admitted having sex with her, had sexual contact about six or seven times thereafter. On one occasion, he relieved her of a debt in exchange for sex with him; on another, he threatened to take her property. In sum, the victim testified that she did not refuse because she knew Bully controlled her life in the program. Here, the State showed by a preponderance of the evidence that Bully committed an offense of sexual assault on K. B. as required for admission of the evidence under Rule 413. See *Dasher*, 281 Ga. App. at 329 (1) (a); cf. *Cooper v. State*, 163 Ga. App. 482, 483 (2) (295 SE2d 161) (1982) (use of threats and violence to get victim to have intercourse was evidence of intent to rape).

(b) C. M. testified that she became a client of a predecessor to RAR operated by Bully when she was required to complete a drug and alcohol treatment program as a part of a probationary sentence. One day in the office at the program, Bully asked her to sit on his lap in a manner that suggested something sexual; she complied. She testified that in rehabilibation, "you don't want to make the owner not like you." He flirted with her, and she tried to laugh it off, but then Bully grabbed her wrist and led her down the hallway to a storage area. He then put his hand around her throat and pushed her into a wall, stuck his tongue "in [her] throat," pulled her pants down, and forced himself onto her for sex. She attempted to resist but was unsuccessful. On a second occasion, he came into her bedroom and without warning, turned her around, pulled her pants down, and forced himself onto her for sex. After these incidents, she felt like a "sex slave for [Bully]." While she was a client of the program, she lived in constant fear of being reported to probation for a violation and possibly sent to prison. She testified that thereafter, "he was threatening me with that every other day." This evidence was sufficient to show by a preponderance of the evidence that Bully committed an offense of sexual assault on C. M. as required for admission of the evidence under Rule 413. See *Farmer v. State*, 197 Ga. App. 267, 267 (1) (398 SE2d 235) (1990) (force present where victim was frightened by appellant's size).

18

(c) H. S. testified that she first encountered Bully when she was ordered by a judge to attend a predecessor to RAR operated by Bully in order to receive assistance for a drug problem. While in the program, Bully threatened to send a "bad" probation report if she would not have sex with him. She testified that she resisted anyway, did not have sex with Bully, and that he never made "an advance physical in nature" and that "he never physically forced me. He just would try to persuade me." As a result of not complying, she was kicked out of the program, eventually charged with a violation of probation for failing to complete the program, and served 18 months in jail. Here the State failed to present any evidence of sexual contact, and therefore failed to show by a preponderance of the evidence that Bully committed an offense of sexual assault as required for admission of the evidence under OCGA § 24-4-413. Cf. *James v. State*, 265 Ga. App. 689, 691 (3) (595 SE2d 364) (2004) (where the State fails to present any evidence of one element of a crime, the conviction must be reversed).

(d) A. Y. testified that she became a client of a predecessor to RAR run by Bully when she was required to complete a drug and alcohol treatment program as part of a probationary sentence. Bully admitting having sex with A. Y. A. Y. described the sexual contact as voluntary; she considered him her boyfriend. At one

19

point, she was informed that Bully had waived the fees she owed for the program, "so I continued having sex [with him.]" Here again, the State failed to show by a preponderance of the evidence that Bully committed an offense of sexual assault as required for admission of the evidence under OCGA § 24-4-413. See *Watson*, 293 Ga. at 822 (2) (mere fact that defendant occupied a position of authority with respect to victim is not sufficient to show "force" given the relevant circumstances).

In sum, the above evidence was sufficient to establish by a preponderance of the evidence that Bully committed an offense of sexual assault on K. B. and C. M. by intimidation and fear of being reported for a probation violation leading to possible incarceration, but insufficient to show that he committed such an offense on H. S. and A. Y.

Harm, including for ineffective assistance of counsel, must be measured cumulatively and will be addressed below. See *State v. Lane*, 308 Ga. 10, 14 (1) (838 SE2d 808) (2020) ("Georgia courts considering whether a criminal defendant is entitled to a new trial should consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel - at least where those errors by the court and counsel involve evidentiary issues.").

5. Bully contends the trial court erred by forcing him to wear a shock belt at trial, which interfered with his right to confer with his attorney and participate in his own defense.

"[T]he use of extraordinary security measures to prevent dangerous or disruptive behavior which threatens the conduct of a fair and safe trial is within the discretion of the trial court." *Young v. State*, 269 Ga. 478, 479 (2) (499 SE2d 60) (1998), overruled on other grounds by *Whitehead v. State*, 287 Ga. 242 (695 SE2d 255) (2010). We therefore review the trial court's decision for abuse of discretion.

The State moved pretrial to compel Bully to wear an electrified shock belt after Bully was heard on two jail phone calls saying that he could "potentially escape or run in court on Monday morning." The court held a hearing on the matter at which Bully stated that it was not necessary, and that he "wants his day in court" and "not to be handicapped or hindered, in any way, whatsoever." Counsel also mentioned that Bully was trained in karate. Nevertheless, Bully did not clearly object at the hearing, nor at any time during the trial. He admitted at the hearing on the motion for new trial that he never told the judge that he had a problem with the shock belt or that he could not talk to his attorney with it on.

"Objections should be made with sufficient specificity for the trial court to identify the precise basis. It is not important in what format the allegation is cast so long as it is clear to the court the specific error alleged that the court may have the opportunity to correct them." (Citations and punctuation omitted.) *Sharpe v. Dept. of Transp.*, 270 Ga. 101, 102 (505 SE2d 473) (1998); see also *Whatley v. State*, 270 Ga. 296, 302 (14) (509 SE2d 45) (1998) (failure to object to shackles as a security measure waives the issue for appellate review.) The record shows that Bully failed to object to the shock belt with sufficient specificity so as to alert the court to the specific legal error alleged and/or give the court the opportunity to correct it. Accordingly, we find no error.

6. Bully contends the trial court erred by instructing the jury on flight.[15] See *Renner v. State*, 260 Ga. 515, 518 (3) (397 SE2d 683) (1990) ("Hereafter, while the [S]tate may offer evidence of and argue flight, it shall be error for a trial court in a criminal case to charge the jury on flight.").

The court gave the following instruction:

---

[15] Evidence was presented to show that after Bully learned about the investigation he moved to Oklahoma, where he was later apprehended.

Evidence of alleged flight has been introduced. Such evidence is governed by the rules concerning circumstantial evidence that you have already been given. Furthermore, you may only consider it if you find more likely than not that Appellant actually committed such act, and that the reason was to evade the charge now on trial.

Bully did not object to the charge. We therefore review for plain error only. See *Cheddersingh v. State*, 290 Ga. 680, 682-683 (2) (724 SE2d 366) (2012). Under that standard, Bully "must establish not only that the jury instruction was erroneous, but also that it was obviously so and that it likely affected the outcome of the proceedings." (Citation omitted.) *Parker v. State*, 305 Ga. 136, 139 (3) (823 SE2d 313) (2019). If each of those factors are met, we may exercise our discretion to remedy the error "if it seriously affect[ed] the fairness, integrity or public reputation of the judicial proceedings." *Willis v. State*, 304 Ga. 122, 129 (2) (c) (816 SE2d 656) (2018).

We hold that the charge as given was not obviously erroneous. First, the Supreme Court has explained that "[t]he prohibited charge is one that states that an inference of guilt may be drawn from the fact of flight." *Shadron v. State*, 275 Ga. 767, 771 (5) (573 SE2d 73) (2002). The charge given in this case does not so state. Second, the charge was taken from a pattern charge that comes with the following

advisory note questioning the continued authority of *Renner* after the adoption of the new Evidence Code in 2013, which is based on the Federal Rules of Evidence: "with the advent of the new rules, authority from the 11th Circuit and other published legal authority suggest that such MAY no longer be the case." See Flight, Georgia Suggested Pattern Jury Instructions - Criminal § 1.36.10. This very point was at issue recently but left undecided in *Burlison v. State*, 353 Ga. App. 341, 344 (836 SE2d 736) (2019). Because Bully has failed to show an obvious error, he cannot show plain error. See *Murphy v. State*, 354 Ga. App. 560, 563 (2) (841 SE2d 153) (2020).

7. Bully also argues that his trial counsel was ineffective in several regards. To succeed on this claim, he must demonstrate both that counsel's performance was deficient and that his counsel's deficient performance was prejudicial to the defense. See *Jackson v. State*, 306 Ga. 266, 272 (5) (830 SE2d 99) (2019).

> When reviewing counsel's performance, we apply a strong presumption that counsel's representation was within the wide range of reasonable professional assistance. As such, a tactical decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have chosen it.

Id. (citations and punctuation omitted). "We accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply

24

the legal principles to the facts." (Citation and punctuation omitted.) *Simmons v. State*, 299 Ga. 370, 375 (3) (788 SE2d 494) (2016).

(a) With regard to three enumerations, we disagree that Bully's trial counsel was deficient for failing to object to evidence showing that he: (i) "focused on extracting money from others and subjected people to poor, unsafe, and unsanitary living conditions"; (ii) used, bought, and distributed illegal drugs; and (iii) took a vehicle from one of the women.

(i) The trial court held that the evidence introduced by the State showing that Bully "focused on extracting money from others and subjected people to poor, unsafe, and unsanitary living conditions," was relevant to Bully's intent to maintain economic control over the women in the RAR program so that they would do his bidding. At the hearing on the motion for new trial, counsel testified that it was not a part of his strategy to allow this testimony.

The evidence did paint the picture described by the trial court. Evidence was presented to show that the women in the program were often in debt to Bully for the program fees and that they sometimes had to perform work for the program to pay off the debts; they were not receiving proper drug and alcohol rehabilitation treatment; they were forced to live in poor conditions; they were not paid for some work they

performed in the program (sometimes being required to perform work at Bully's residence); and they were told that money would be taken off their "books" due to the sex they had with Bully. And Bully repeatedly threatened to expel women from the program for failure to pay. There was testimony that some of the women feared every day that they would be discharged for failure to pay and end up back in jail. One of the victims testified that Bully told her that he could do anything he wanted with her because she was subject to an eight-year sentence.

Thus, this evidence does show a pattern by Bully of exercising financial dominance and control of these women that sheds light on whether the victims consented to his actions. See *Harris*, _ Ga. _ at (2) (b) (Case No. S20A0786, decided Oct. 19, 2020) (holding that evidence regarding why defendant had to leave his ex-girlfriend's house, including that the defendant broke her windowns and threatened her life was intrinsic to murder of the person whose home defendant moved into). Accordingly, we conclude that any objection would have been properly overruled. And, therefore, Bully cannot show ineffective assistance of counsel for failure to prevent introduction of evidence of his acts of extracting money from other women at RAR and subjecting them to poor, unsafe, and unsanitary living conditions.

(ii) Bully contends his counsel should have moved to exclude the introduction of evidence that he used, bought, and distributed illegal drugs. As described in his brief, and as accurately reflected in the record, the evidence shows that

> On direct examination, the State elicited testimony from [S. R. L.] that [Bully] "did drugs"; from [K. C.] that [Bully] and his girlfriend were doing drugs with customers at RAR, and that [Bully] purchased drugs for his girlfriend . . .; and from [an FBI agent] that there were numerous accusations of narcotics trafficking at RAR. Trial counsel also accidentally elicited from [S. R. L.] that [Bully] "was a drug dealer" who "sold a bunch of ice and methamphetamines." Counsel testified that it was not his strategy to allow this evidence. The trial court concluded that the drug evidence was used "to establish how Defendant kept the women addicted in order to keep them in control."

In fact, some evidence was presented to show that Bully did drugs with individuals in the program and then had them drug-tested knowing that they would fail. That evidence supported allegations that Bully abused his power over the women in the program. This drug evidence, therefore, was intrinsic to the charged crimes and an objection by counsel would have been without merit. Accordingly, trial counsel was not ineffective in eliciting, failing to object, or failing to move to strike this evidence. See *Harris*, _ Ga. _ (2) (b) (Case No. S20A0786, decided Oct. 19, 2020); see also *Jackson v. State*, 330 Ga. App. 108, 117 (4) (e) (766 SE2d 558) (2014)

("Failure to make a meritless objection cannot be evidence of ineffective assistance.") (citation and punctuation omitted).

(iii) Trial counsel also failed to object to evidence that Bully took a vehicle from K. C., one of the victims.[16] But evidence showed that he took the vehicle as a payment for a fine incurred by K. C. for failing a drug test. And the trial court held that under the facts of the case, the incident again showed that Bully exerted his will over the female probationers financially and otherwise, which was relevant to the issue of consent to the crimes at issue. Thus, for these reasons and those given in Division 7 (a) (i), we hold that the evidence was intrinsic to the crimes charged, and an objection would have been without merit. See *Jackson*, 330 Ga. App. at 117 (4) (e).

(b) Bully contends trial counsel erred by failing to object to evidence that Bully had a criminal history, including three felony convictions, on the ground that the convictions were more than 10 years old and, therefore, not automatically admissible

---

[16] The witness clearly testified that Bully took a vehicle from her that was titled in her father-in-law's name, sold it to someone else, and did not tender any money in exchange.

under OCGA § 24-6-609 (b).[17] He further contends that his trial counsel erred by eliciting this information from Bully on direct examination.

In connection with presenting its last witness, the State announced that it intended to play for the jury recordings of three investigatory interviews taken of Bully that referred to Bully's past criminal history. Bully's counsel moved to suppress the relevant portions of the interviews on the ground that Bully had not put his character in evidence. The prejudicial statements in the transcripts were limited to the following: that Bully had a "pretty extensive" criminal history and that he was a "convicted felon." The State argued, and after confirming that Bully intended to testify, the trial court agreed that the information could come in for an independent reason — to rebut Bully's attempts to separate himself from being "part of the

---

[17] OCGA § 24-6-609 (b) provides:
Evidence of a conviction under this Code section shall not be admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for such conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

29

authority figures at [RAR]" by asserting that his wife owned the business.[18] Bully's counsel never objected to evidence of Bully's criminal history on the ground that it was more than ten years old. Shortly after the interviews were played for the jury, the State rested.

In connection with Bully testifying in his own defense, the State then sought the admission of three Oklahoma convictions for purposes of impeachment under Rule 609 (a), and asserted that the probative value of the evidence outweighed any prejudicial effect under that Code subsection. Bully's trial counsel did not object on any ground; thus, he failed to raise that under Rule 609 (b) convictions older than ten years can only be admitted for impeachment purposes if the court determines "that the probative value of the conviction supported by specific facts and circumstances *substantially* outweighs its prejudicial effect." (Emphasis supplied.) OCGA § 14-6-609 (b). On direct examination of Bully, his trial counsel elicited from him that he had prior convictions for pointing a firearm, transporting a loaded firearm, second-degree burglary, and first-degree burglary. On cross-examination, the State questioned Bully about the details of each incident, obtaining an admission that he

---

[18] This evidence appears to have been admitted in support of the counts of sexual assault on a probationer.

pointed a firearm at another human being with the intent of scaring that person and putting them (him or her) in fear of losing their life.

At the hearing on the motion for new trial, Bully's counsel testified that he was not aware of Rule 609 (b). He further testified that his trial strategy was to "take the sting out" of such evidence by having Bully testify about the information on direct. The trial court held that trial counsel made a strategic decision to present Bully as an "honest person" by admitting to his convictions given that they had been deemed admissible, and that this strategy was "a common practice" and not "objectively unreasonable."

We find that trial counsel's failure to raise a Rule 609 (b) objection, followed by his introduction of the evidence on direct examination, constitutes deficient performance. A trial strategy must be objectively reasonable, and this was not. See *Entwisle v. State*, 340 Ga. App. 122, 129 (1) (b) (796 SE2d 743) (2017). No competent counsel would fail to object to evidence of his client's bad character when a rule of evidence directly on point gives a basis for excluding the evidence. See id. By objecting based on Rule 609 (b), counsel could have forced the court to consider whether the probative value of attacking Bully's credibility with old felony convictions substantially outweighed the prejudicial effect. The argument might have

been persuasive given that the State had already attacked Bully's credibility in other ways, including a showing that he had lied to an FBI agent.

(c) Bully contends his counsel was ineffective by failing to object to hearsay and bad character evidence[19] contained in recordings of phone calls made between him and his wife on the third night of trial. Although Bully's wife did not testify, the recording was played for the jury. The recording included statements by Bully's wife that strongly reflected on his character.[20]

As held in *Glispie v. State*, 300 Ga. 128, 131 (1) (793 SE2d 381) (2016), Bully's own statements in the conversation, i.e., the outgoing messages, were admissible as the admissions of a party under OCGA § 24-8-801 (d) (2) (A). His wife's statements, however, do not fall under this hearsay exception. *Glispie*, 300 Ga. at 131 (1). The State argued that the wife's statements provided context for Bully's own half of the conversation and that they were, therefore, admissible.

[19] Although Bully's counsel appears to have objected on public policy grounds, there is no indication that he objected on the grounds of hearsay or inadmissible evidence of bad character.

[20] Of the statements highlighted by Bully on appeal, only the following constituted possible hearsay under OCGA § 24-8-801 (c): (1) "I guess cause you keep putting your dick out there for everybody to suck and for you to fuck. . . cause you. . . can't keep it in your pants. That's why you're in there."; and (2) "Cause I finally got tired of your dumbass mouth and your lies and your bullshit."

32

In *Johnson v. State*, 347 Ga. App. 831, 840 (2) (821 SE2d 76) (2018), the appellant argued that text messages from his cell phone should have been excluded as inadmissible hearsay. This Court held that although the outgoing messages were admissible under *Glispie*, a blanket admission of the incoming messages on the grounds that they provide context for the appellant's statements was erroneous. Id. at 843 (2) (b) (ii). Rather, the entire conversation must be reviewed to determine which of the incoming messages are true hearsay and not otherwise admissible, and which are admissible to give context to the defendant's statements. See Id.; *United States v. Rivera*, 780 F3d 1084, 1092-1093 (III) (A) (2) (11th Cir. 2015).

The statements by Bully's wife quoted in footnote 20 herein were clearly offered to show Bully's motive or intent for committing the crimes or to attack his character, and they were offered for the truth of the matter asserted. See OCGA § 24-8-801 (c). Accordingly, they were hearsay, and Bully's counsel testified that he had no strategic reason for not objecting to them. No competent trial counsel should have failed to object to the true hearsay statements from the phone calls, and Bully's counsel was therefore deficient in failing to make such an objection. See *Entwisle*, 340 Ga. App. at 129 (1) (b) (trial strategy must be objectively reasonable).

(d) Bully contends his trial counsel was deficient when he elicited, opened the door, or failed to object to several instances of irrelevant, extrinsic bad character evidence that Bully engaged in sex trafficking. The State argues that the evidence was intrinsic to the crimes of which Bully was charged.

The complained of evidence came from three witnesses. First, Rule 413 witness C. M. testified that on one occasion, Bully took her to a hotel and she was "there to be a prostitute" for Bully; trial counsel objected and the court instructed the jury to disregard the statement. But later, the court held that trial counsel opened the door to C. M.'s testimony by questioning her about her "work." The State exploited the opening by eliciting from C. M. that she worked as a prostitute for Bully every day for two and a half weeks, sleeping with 25 men during that time. Second, victim S. R. L. testified, in response to Bully's counsel's questions, that she had learned that Bully "liked to prostitute women." Third, a probation officer testified about a release order for victim M. T. which stated that RAR was "under investigation for federal human trafficking charges and [M. T.] is a victim in this case."

With the exception of his initial objection to one statement by C. M., after which he opened the door to the statements described above, trial counsel did not object, move to strike, or request curative instructions to any of the above testimony.

34

At the hearing on the motion for new trial, counsel testified that it was not his strategy to elicit or allow evidence that Bully had engaged in sex trafficking or prostitution.[21]

The State argues that all of the above testimony was not objectionable because it was "intrinsic" to the charged offenses, and that "[t]he limitations and prohibition on 'other acts' evidence set out in [Rule 404 (b)] do not apply to 'intrinsic evidence.'" (Footnote omitted.) *Williams v. State*, 302 Ga. 474, 485 (IV) (d) (807 SE2d 350) (2017). Evidence is intrinsic when it is "(1) an uncharged offense arising from the same transaction or series of transactions as the charged offense; (2) necessary to complete the story of the crime; or (3) inextricably intertwined with the evidence regarding the charged offense." (Citations and punctuation omitted.) Id. Evidence that explains the context of the crime is admissible if it "forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury." (Citations and punctuation omitted.) Id. at 485-486 (IV) (d).

We conclude that the sex-trafficking evidence was not intrinsic to the counts of rape, sexual battery, and aggravated sodomy for which Bully was tried and

[21] In denying the motion for new trial, the trial court held that counsel did object to C. M.'s testimony, but the court failed to address counsel opening the door to further evidence. The trial court held that the statements that Bully "liked to prostitute women" and that RAR was under investigation for sex trafficking was not bad character evidence; we disagree.

convicted. Bully was not charged with a crime of sex trafficking, and none of the witnesses testified that Bully used force or intimidation to force anyone to engage in prostitution. Further, it was not necessary to complete the story of the charged offenses or inextricably intertwined with the evidence regarding those offenses. Compare *Priester v. State*, _ Ga. _ (2) (845 SE2d 683) (2020) (evidence that defendant was engaged in dealing drugs was intrinsic evidence in a murder prosecution where evidence of the defendant's drug business was relevant to his motive to rob the victim); *Williams v. State*, _ Ga. App. _ (3) (846 SE2d 190) (2020) ("evidence related to Williams's gang membership was intrinsic to the charged crimes of aggravated assault and aggravated battery . . . as it put the crime in the context and served to explain why Williams participated in a seemingly unprovoked attack on the victim"). Thus, trial counsel's act of eliciting, opening the door, and failing to object to evidence that Bully was engaged in sex trafficking/prostitution was deficient performance. No competent trial counsel would allow introduction of this evidence for any strategic reason. See *Sanchez-Villa v. State*, 341 Ga. App. 264, 271-272 (1) (a) (799 SE2d 364) (2017) (finding that evidence was not intrinsic); compare *Harris v. State*, _ Ga. _ (2) (b) (Case No. S20A0786, decided Oct. 19, 2020) (discussing intrinsic evidence).

36

8. In accordance with *State v. Lane*, we now consider whether Bully is entitled to a new trial by collectively considering the prejudicial effect of trial court errors involving evidentiary issues and counsel's deficient performance. See 308 Ga. at 14 (1).

With regard to the admission of Rule 413 evidence by H. S. and A. Y., given that there were four other prior-act witnesses to similar behavior by Bully, any possible error in the admission H. S.'s and A. Y.'s sexual encounters with Bully "was cumulative of other admissible evidence, and therefore, any error in its admission can be deemed harmless beyond a reasonable doubt." *Akhimie v. State*, 297 Ga. 801, 807 (3) (777 SE2d 683) (2015); see also *Taylor v. State*, 306 Ga. 277, 283 (2) (830 SE2d 90) (2019) ("The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict.") (citation and punctuation omitted).

"To establish prejudice [for ineffective assistance of counsel], Appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citation and punctuation omitted.) *Watson v. State*, 303 Ga. 758, 762 (2) (d) (814 SE2d 396) (2018). Counsel rendered defective performance by: (1) failing to object to and

eliciting evidence that Bully had a criminal history, including three felony convictions; (2) failing to object to evidence of the hearsay portions of Bully's wife's statements in the telephone call; and (3) eliciting, opening the door, and failing to object to evidence suggesting that Bully was engaged in sex trafficking/prostitution.

The admission of Bully's prior criminal history led directly to Bully admitting on the stand that he intentionally pointed a firearm at another person in order to put that person in fear of his or her life. Bully's wife's comments to the effect that he could not reign in his sexual desires was prejudicial, although it was cumulative of other testimony, including Bully's own admissions that he had a wife and a girlfriend and had sex with two of the victims and two of the Rule 413 witnesses. The evidence suggesting that Bully was engaged in sex trafficking/prostitution was highly prejudicial in that it suggested he was involved in a larger criminal enterprise, not just sexual crimes against individual women.

On the other hand, the evidence against Bully that he committed the charged crimes was strong. The evidence is overwhelming that Bully had sexual contact with numerous female probationers at RAR. Thus, the principle issue remaining was whether Bully's sexual contact with the victims resulted from force or Bully's pattern of threatening and intimidating the victims, or whether the victims consented to the

sexual contact. The State presented an abundance of evidence that Bully asserted authority and control over the female probationers at RAR, through both his financial power, and through threatening and intimidating behavior that included threats to report probation violations in order to coerce the victims into sexual acts. Bully also exploited the probationers' weaknesses for taking drugs. In addition, the testimony of five victims and the four properly admitted Rule 413 witnesses showed Bully's consistent practice of using RAR clients to satisfy his sexual desires through the use of force and intimidation. Although Bully claimed that sex with at least two of the victims was consensual, his credibility was impeached with evidence that he lied to investigators and lied under oath to a federal agent, and that he had threatened a co-employee's children because the co-employee was cooperating with the investigation.

Based on the exceedingly strong evidence presented by the State, we conclude that there is no reasonable probability that, but for the above-referenced errors by counsel, the result of the proceeding would have been different. See *Lofton v. State*, _ Ga. _ (7) (846 SE2d 57) (2020); *Watson*, 303 Ga. at 762 (2) (d). Accordingly, Bully's claim of ineffective assistance of counsel fails, and the trial court did not err by denying Bully's motion for new trial.

9. Bully contends that his trial counsel was deficient by failing to object to imposition of a recidivist sentence under OCGA § 17-10-7 (c) because one Oklahoma crime used against him at sentencing would not have constituted a felony under Georgia law. "Based on our review of his brief, [Bully] has improperly framed a sentencing error claim as an ineffective assistance of counsel claim." *Hogg v. State*, _ Ga. App. _ (846 SE2d 183) (2020). The appellate courts may nevertheless address obvious sentencing errors, even if not properly raised on appeal. See *Jackson v. State*, 306 Ga. 266, 276-277 (6) (830 SE2d 99) (2019) (addressing issue regarding recidivist sentencing).

Of the three prior Oklahoma convictions admitted in support of recidivist sentencing under OCGA §17-10-7 (c), one consisted of a single 1991 indictment alleging both the pointing of a firearm and the transporting of a loaded firearm. The trial court concluded that the conviction of pointing a firearm constituted the felony of aggravated assault under Georgia law. The trial court considered the "Information Sheet" concerning Appellant's conviction from Oklahoma, finding the language of the charge being:

> "Jeffery Dewayne Bully, who willfully, knowingly, and without lawful
> cause, pointed a handgun . . . for the purpose of threatening and

40

intimidating . . . and with the malicious and felonious intent to injure . . . "

On appeal, Bully contends the elements of the Oklahoma crime of pointing a deadly weapon constitutes only a misdemeanor under Georgia law, see OCGA § 16-11-102, whereas the felonious crime of of aggravated assault by pointing a deadly weapon under Georgia law requires proof that the victim had a reasonable apprehension of immediate violent injury. See OCGA § 16-5-21 (a) (2). See *Overton v. State*, 305 Ga. 597, 600 (2) (825 SE2d 159) (2019) ("If the pointing of a firearm places the victim in reasonable apprehension of immediate violent injury, then the felony of aggravated assault, rather than the misdemeanor of pointing a gun, has occurred.") (citation and punctuation omitted.) See also *Nordahl v. State*, 306 Ga. 15, 17-18 (1) (829 SE2d 99) (2019) (explaining proper procedure for comparing crimes in different states).

Under *Nordahl*, a Georgia sentencing court should normally "parse[] the elements of the prior out-of-state . . . crime and determine[] whether those elements satisfy the statutory definition of a felony under Georgia law." *Nordahl*, 306 Ga. at 23 (3) (emphasis omitted). Or, if "confronted with a prior conviction for violating a statute that sets forth multiple crimes and is, thus, 'divisible,' . . . sentencing courts

[may] look beyond the statutory elements of the crime to 'the charging paper and jury instructions' used in a case." (Citation and punctuation omitted.) Id.

At the time of the relevant incident, the Oklahoma crime of pointing a deadly weapon provided that it was a felony to point a deadly weapon at another person "for the purpose of threatening or . . . for any purpose of injuring, either through physical injury or mental or emotional intimidation. . . ." 1971 Ok. L. p. 460, § 16. As can be seen, neither the elements of the Oklahoma crime nor the "Information Sheet" showed that the Oklahoma crime required a showing that the victim had a reasonable apprehension of immediate violent injury. See *Crane v. State*, 297 Ga. App. 880, 883 (2) (678 SE2d 542) (2009) ("[I]t is the victim's reasonable apprehension of injury from an assault by a deadly weapon that establishes the crime of aggravated assault, not the assailant's intent to injure.") (citation and punctuation omitted.)

Accordingly, we conclude that the trial court erred in determining that Bully was subject to a recidivist sentence under OCGA § 17-10-7 (c). We therefore vacate

Bully's sentence and remand for resentencing consistent with this opinion. See *Jackson*, 306 Ga. at 276-277 (6).

*Judgment affirmed in part, reversed in part, and vacated in part, and case remanded with direction. Brown, J., concurs and Dillard, P. J., concurring fully and specially.*

# In the Court of Appeals of Georgia

A20A0882. BULLY v. THE STATE.

DILLARD, Presiding Judge, concurring fully and specially.

I agree with the majority that Bully is not an "agent of any probation or parole office" within the meaning of former OCGA § 16-6-5.1 (b) (2).[22] Unfortunately,

---

[22]*See* 2010 Ga. Law 168, 169 § 2 (not defining "agent" in OCGA § 16-5-5.1 (a) but specifying in OCGA § 16-5-5.1 (b) (2) that "[a] person who has supervisory or disciplinary authority over another individual commits sexual assault when that person: . . . [i]s an employee or agent of any probation or parole office and engages in sexual contact with such other individual who the actor knew or should have known is a probationer or parolee under the supervision of the same probation or parole office").

1

Bully's egregious conduct of preying upon and sexually abusing vulnerable women entrusted to his program is not covered by the subsequent amendment to this statute,[23] by the *current* law,[24] or by the amended version of the law that will become effective on January 1, 2021.[25] But it should be. Bully—as the owner and operator of an unaccredited, unlicensed inpatient drug rehabilitation center—used his supervisory power to sexually harass, intimidate, and assault several women who were in his care *as a condition of their probation*. This is exactly the type of conduct OCGA § 16-6-

---

[23] *See* 2015 Ga. Law 422, 471 § 5-20 (only amending OCGA § 16-5-5.1 (b) (2) to provide for sexual assault by "an employee or agent of any community supervision office, county juvenile probation office, Department of Juvenile Justice juvenile probation office, or probation office under Article 6 of Chapter 8 of Title 42 and engages in sexual contact with such other individual who the actor knew or should have known is a probationer or parolee under the supervision of the office").

[24] *See* OCGA § 16-5-5.1; *see also* 2019 Ga. Law 912, 912-13 § 1 (amending OCGA § 16-5-5.1 to provide a definition of agent in OCGA § 16-5-5.1 (a) (1) as "an individual authorized to act on behalf of another, with or without compensation" and OCGA § 16-5-5.1 (b) (2) to provide that "[a]n employee or agent commits the offense of improper sexual contact by employee or agent in the first degree when such employee or agent knowingly engages in sexually explicit conduct with another person whom such employee or agent knows or reasonably should have known is contemporaneously: . . . [u]nder probation, parole, accountability court, or pretrial diversion supervision of the office or court of which he or she is an employee or agent").

[25] *See* 2020 Ga. Law (Act 480) § 1 (providing for amendments to portions of OCGA § 16-5-5.1 other than OCGA § 16-5-5.1 (a) (1) or OCGA § 16-5-5.1 (b) (2)), with amendments strictly related to foster care).

5.1 (b) (2) seeks to address and punish, and the statute should be amended to cover it. I strongly urge the General Assembly to do what we (as judges) are not at liberty to do—make this specific conduct a crime or otherwise enact safeguards from this sort of evil, dehumanizing behavior.